## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **In re** | Chapter 11 |
| **IMERYS TALC AMERICA, INC.,** *et al.*[1] | Civ. Action No. _____ |
|  | Bankr. Case No. 19-10289 (LSS) |
| **Debtors.** | Jointly Administered |

### DECLARATION OF JOHN J. NOLAN, ESQ. IN SUPPORT OF JOHNSON & JOHNSON'S AND JOHNSON & JOHNSON CONSUMER INC.'S MOTION TO FIX VENUE FOR CLAIMS RELATED TO IMERYS'S BANKRUPTCY UNDER 28 U.S.C. §§ 157(b)(5) AND 1334(b)

I, John J. Nolan, Esq., hereby make the following declaration under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1.      I am an associate at the law firm of Weil, Gotshal & Manges LLP, co-counsel to Johnson & Johnson and Johnson & Johnson Consumer Inc. in the above-captioned case.   I respectfully submit this declaration in support of *Johnson & Johnson and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b).*

2.      Attached hereto as **Exhibit 1** is a true and correct copy of the Declaration of Alexandra Picard, Chief Financial Officer of the Debtors in Support of Chapter 11 Petitions and First Day Pleadings, dated February 13, 2019, publicly available at *In re Imerys Talc America, Inc.*, Case No. 19-10289-LSS (Bankr. D. Del.) [D.I. 10].

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of excerpts of the Talc Supply Agreement between Windsor Minerals Inc. and Johnson & Johnson Baby Products Company, a division of Johnson & Johnson Consumer Products, Inc., dated January 6, 1989, obtained from the records of Johnson & Johnson and Johnson & Johnson Consumer Inc. (collectively, "J&J").  If the Court would like a complete copy of Exhibit 2, J&J will make that available to the Court.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of excerpts of the Supply Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated April 15, 2001, obtained from J&J's records. If the Court would like a complete copy of Exhibit 3, J&J will make that available to the Court.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of excerpts of the Material Purchase Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated for term of year ending 2011 (superseded by Exhibit 5), obtained from J&J's records. If the Court would like a complete copy of Exhibit 4, J&J will make that available to the Court.

6.      Attached hereto as **Exhibit 5** is a true and correct copy of excerpts of the Material Purchase Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated for term of year ending 2011, obtained from J&J's records. If the Court would like a complete copy of Exhibit 5, J&J will make that available to the Court.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of excerpts of the Amendment to Supply Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated April 1, 2004, obtained from J&J's records. If the Court would like a complete copy of Exhibit 6, J&J will make that available to the Court.

8.      Attached hereto as **Exhibit 7** is a true and correct copy of excerpts of the Stock Purchase Agreement between Cyprus Mines Corporation and Johnson & Johnson, dated January 6, 1989, obtained from J&J's records. If the Court would like a complete copy of Exhibit 7, J&J will make that available to the Court.

9.      Attached hereto as **Exhibit 8** is a true and correct copy of Johnson & Johnson Consumer Inc. and Johnson & Johnson's January 2019 Amended Supplemental Responses to Plaintiffs' Supplemental Interrogatories and Initial Requests for Production of Documents obtained from J&J's records. If the Court would like a complete copy of Exhibit 8, J&J will make that available to the Court.

10.     Attached hereto as **Exhibit 9** is a true and correct copy of the Consent, Assignment, and Assumption Agreement between Cyprus Windsor Minerals Corporation and Johnson & Johnson Baby Products Company, effective as of June 29, 1992, obtained from J&J's records.

11.     Attached hereto as **Exhibit 10** is a true and correct copy of the Amendment Agreement between Johnson & Johnson Consumer Products, Inc., and RTZ America, Inc., dated December 31, 1996, obtained from J&J's records.

12.     Attached hereto as **Exhibit 11** is a true and correct copy of a letter from Richard J. Meli to Karen A. Pfirman, dated June 15, 2000, obtained from J&J's records.

13.     Attached hereto as **Exhibit 12** is a true and correct copy of the Indemnification Demand Notice for Ovarian Cancer Lawsuits Letter from Imerys Talc America, Inc. to J&J Baby Products Company, dated June 23, 2015, obtained from J&J's records.

14.     Attached hereto as **Exhibit 13** is a true and correct copy of The Proposed Future Claimants' Representative's Motion to Intervene, dated March 29, 2019, publicly available at *In*

*re Imerys Talc America, Inc. (Imerys Talc America, Inc., et al. v. Cyprus Amax Minerals Company)*, Adv. Pro. No. 19-50115 (LSS) (Bankr. D. Del.) [D.I. 25].

15.    Attached hereto as **Exhibit 14** is a true and correct copy of the Transcript of Hearing Before Honorable Brendan L. Shannon United States Bankruptcy Judge, dated August 16, 2017, publicly available at *In re TK holdings, Inc. (TK Holdings, Inc. v. State of Hawaii)*, Adv. Pro. No. 17-50880 (Bankr. D. Del.) [D.I. 64-3].

16.    Attached hereto as **Exhibit 15** is a true and correct copy of the Memorandum Order issued by United States District Judge Joseph Farnan, dated May 22, 2006, publicly available at *Hopkins, et al., v. Plant Insulation Company*, *et al.*, Civil Action No. 06-cv-00298-JJF (D. Del.) [D.I. 21].

17.    Attached hereto as **Exhibit 16** is a true and correct copy of the primary products liability policy for the period January 1, 1973 to January 1, 1974, issued by the Aetna Casualty and Surety Company, obtained from J&J's records.

18.    Attached hereto as **Exhibit 17** is a true and correct copy of excerpts of a February 2, 2016 letter from David B. Smith, an Insurance and Risk Management Consultant at Farella Braun and Martel LLP, to Claims Adjusters regarding Named Insured: Johnson & Johnson, obtained from J&J's records. If the Court would like a complete copy of Exhibit 17, J&J will make that available to the Court.

19.    Attached hereto as **Exhibit 18** is a true and correct copy of a September 13, 2017 letter from Scot Erikson, a Director of the Specialty Liability Group of Travelers Casualty and Surety Company, to Zsofia Parker, obtained from J&J's records.

Dated: April 18, 2019
      New York, New York

                                /s/ John J. Nolan
                                John J. Nolan

# EXHIBIT 1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------- x
In re:                                          :   Chapter 11
                                                :
IMERYS TALC AMERICA, INC., et al.,              :   Case No. 19-_____ (_____)
                                                :
         Debtors.¹                              :   Joint Administration Pending
                                                :
-------------------------------------------------------- x
```

## DECLARATION OF ALEXANDRA PICARD, CHIEF
## FINANCIAL OFFICER OF THE DEBTORS IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

Under 28 U.S.C. § 1764, Alexandra Picard declares as follows under the penalty of perjury:

1.      I am the Chief Financial Officer of Imerys Talc America, Inc., Imerys Talc Vermont, Inc., and Imerys Talc Canada Inc.  Imerys Talc America, Inc. is incorporated in Delaware and is an affiliate of the other debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**").  Since I began working with the Debtors and their affiliates, I have served in various roles, including the Deputy Group Treasurer, the Finance Director for the Talc North America Division, and the Vice President of Finance.  I have served as Chief Financial Officer of the Debtors since December 2018.  I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtors.

2.      I am responsible for overseeing the operations and financial activities of the Debtors, including but not limited to, monitoring cash flow, business relationships, and financial planning.  As a result of my tenure with the Debtors, my review of public and non-public

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (8410), Imerys Talc Vermont, Inc. (8414), and Imerys Talc Canada Inc. (8416).  The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

documents, and my discussions with other members of the Debtors' management team, I am generally familiar with the Debtors' businesses, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisers that report to me in the ordinary course of my responsibilities. I am authorized by each of the Debtors to submit this First Day Declaration. References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.      On February 13, 2019 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**"). The Debtors will continue to operate their businesses and manage their properties as debtors in possession.

4.      I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief that were filed under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "**Bankruptcy Code**") and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**").[2] The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Cases on their businesses. I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted

---

[2]      Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

operation of the Debtors' businesses and to successfully maximize the value of the Debtors' estates.

5.     Part 1 of this First Day Declaration provides an overview of the Debtors' businesses, organizational structure, and prepetition indebtedness, as well as a discussion of certain pending litigation and the events leading to the Debtors' chapter 11 filings.  Part 2 sets forth the relevant facts in support of the First Day Pleadings.

**PART 1**

**I.     COMPANY AND BUSINESS OVERVIEW**

    **A.     Background**

6.     There are three Debtors in these Chapter 11 Cases:  Imerys Talc America, Inc. ("**ITA**"), Imerys Talc Vermont, Inc. ("**ITV**"), and Imerys Talc Canada Inc. ("**ITC**").  As shown in the simplified corporate organization chart attached hereto as Exhibit A, ITA is the direct parent of ITV, and ITC is an affiliate of ITA and ITV.[3]

7.     The Debtors' operations are exclusively focused on the mining, processing, and/or distribution of talc.  The Debtors supply talc to third-party manufacturers for use in such parties' products.  They do not, however, manufacture the final products or sell such products directly to consumers.

8.     The Debtors are facing significant potential liabilities as a result of thousands of claims by plaintiffs alleging personal injuries caused by exposure to talc mined, processed, and/or distributed by one or more of the Debtors (the "**Talc Claims**").[4]  The Debtors

---

[3]     ITA is incorporated in Delaware, ITV is incorporated in Delaware, and ITC is incorporated in Canada.  Certain assets owned by ITC, including bulk product inventory and a professional retainer, are located in the United States.

[4]     While Debtor ITC has not been named in any talc litigation to date, the Debtors constitute the entirety of the Imerys Group's North American talc operations.  As a result, ITC's day-to-day operations rely upon and regularly interact with the day-to-day operations of Debtors ITA and ITV.  In addition, ITC

3

believe that the Talc Claims are entirely without merit, as the safety of talc has been confirmed by dozens of peer-reviewed studies and multiple regulatory and scientific bodies.

9.      As of the Petition Date, one or more of the Debtors has been sued by approximately 14,650 individual claimants.  The overwhelming majority (approximately 98.6%) of the Talc Claims asserted against the Debtors are based on personal injury allegedly arising from the plaintiffs' exposure to cosmetic talc.  As described in further detail in Section II below, while the Debtors have access to valuable insurance assets that they have relied on to fund their defense and appropriate settlement costs to date, the Debtors have been forced to fund certain litigation costs and settlements out of their free cash flow due to a lack of currently available coverage for certain Talc Claims, or insurers asserting defenses to coverage.  The Debtors lack the financial wherewithal to litigate against the mounting Talc Claims being asserted against them in the tort system.

10.      The Debtors' decision to commence the Chapter 11 Cases was prompted by certain recent developments arising from the growing number of Talc Claims in the United States. These developments include: (i) the significant increase in settlement demands with respect to cosmetic Talc Claims in the wake of recent verdicts, including a multi-billion dollar verdict rendered against Johnson & Johnson ("**J&J**"), and the ensuing media focus on talc for cosmetic applications; (ii) the increased unwillingness of the Debtors' insurers and third party contractual indemnitors to provide coverage for the Debtors' mounting defense costs and potential liability exposure; and (iii) recent constructive discussions with a proposed future claims representative that led the Debtors to conclude that the Chapter 11 Cases would be the optimal path for resolving

---

may face potential future litigation as the majority of the talc produced by ITC is exported into the United States.

4

their historical talc-related liabilities in a manner that maximizes distributable value for all stakeholders.

11.     The Debtors' primary goal in filing these Chapter 11 Cases is to confirm a consensual plan of reorganization pursuant to Sections 105(a), 524(g), and 1129 of the Bankruptcy Code that channels all of the present and future Talc Claims to a trust vested with substantial assets and provides for a channeling injunction prohibiting claimants from asserting against any Debtor or non-debtor affiliate any claims arising from talc mined, produced, sold, or distributed by any of the Debtors prior to their emergence from these Chapter 11 Cases.  While the Debtors dispute all liability as to the Talc Claims, the Debtors believe this approach will provide fair and equitable treatment of all stakeholders.

**B.     History of the Debtors**

12.     The Debtors have been owned by various entities over their over 100-year history.  In 1989, J&J sold the stock of Windsor Minerals, Inc. ("**Windsor**"), which is now known as ITV, to Cyprus Mines Corporation ("**Cyprus**").  In 1992, Cyprus and its affiliates transferred such stock and all of their other assets in the talc business to a newly formed subsidiary, Cyprus Talc Corporation.  Contemporaneously with the 1992 transfer, RTZ America, Inc. (later known as Rio Tinto America, Inc.) purchased the outstanding shares of Cyprus Talc Corporation.  Also in 1992, Cyprus Talc Corporation was renamed Luzenac America, Inc. ("**Luzenac America**"), which is now known as ITA.

13.     The Debtors were acquired by the "Imerys Group"[5] in 2011 through an Imerys Group holding company, Mircal S.A.  Mircal S.A. entered into an agreement with Rio

---

[5]     The Imerys Group is a French multinational corporation comprised of over 360 affiliated entities directly and indirectly owned by non-debtor affiliate entity Imerys S.A. ("**Parent**").  Other than the three

US-DOCS\105945964.1

Tinto America, Inc. to purchase the stock of the Rio Tinto Group's talc operations, including the stock of Luzenac America and Windsor.  The stock purchase agreement entitled Mircal S.A. to substitute other members of the Imerys Group to acquire individual talc-related entities from the Rio Tinto Group, and Mircal S.A. exercised that right to cause Imerys Minerals Holding Limited (UK), an indirect, non-debtor subsidiary of Parent, to acquire the outstanding shares of Luzenac America.  At the same time, Mircal S.A. also acquired the stock of Luzenac, Inc. ("**Luzenac**"), which is now known as ITC, from another member of the Rio Tinto Group, QIT Fer & Titane, Inc.  Mircal S.A. remains the direct parent entity of ITC.  Luzenac America, Windsor and Luzenac— the three Debtors in these Chapter 11 Cases—subsequently changed their names to ITA, ITV, and ITC, respectively.  At the time of the Imerys Group's acquisition of the Debtors in 2011, there were only approximately eight Talc Claims pending against the Debtors, each of which was in the early stages of litigation.  Most of the Talc Claims allege exposure to talc prior to the Imerys Group's acquisition of the Debtors in 2011.

   14.  A timeline of the ownership history of each of the Debtors is set forth below:

---

Debtor entities, none of the other entities in the Imerys Group is seeking protection under chapter 11 or any other insolvency law.

| | |
|---|---|
| 1916 | Sierra Talc Company formed |
| 1964 | Cyprus Mines Corporation acquires 100% of the stock of Sierra Talc Company |
| 1965 | Cyprus Mines Corporation acquires assets of United Clay Company and Sierra Talc Company and United Clay Company assets are merged to form United Sierra Division of Cyprus Mines Corporation |
| 1973 | United Sierra Division of Cyprus Mines Corporation is renamed as Cyprus Industrial Minerals Company |
| 1979 | Cyprus Georesearch Company, a subsidiary of Cyprus Mines Corporation, acquires assets from American Talc Company, Metropolitan Talc, and Resource Processors, Inc., which were subsidiaries of Charles Mathieu, Inc. Cyprus Mines Corporation merges with Amoco CYM Corporation (a subsidiary of Standard Oil (Indiana)), with Cyprus Mines Corporation named as surviving corporation.  Cyprus Mines Corporation becomes a direct subsidiary of Amoco Minerals Company, which is a direct subsidiary of Standard Oil (Indiana). |
| 1985 | Amoco Minerals Company changes its name to Cyprus Minerals Company. Amoco Corporation (f/k/a Standard Oil (Indiana)) divests stock of Cyprus Minerals Company, with Cyprus Minerals Company and its wholly-owned subsidiary, Cyprus Mines Corporation, becoming a stand-alone, publicly traded entity |
| 1989 | Cyprus Mines Corporation purchases 100% stock of Windsor Minerals, Inc., a wholly-owned subsidiary of Johnson & Johnson<br>Windsor Minerals, Inc. changes its name to Cyprus Windsor Minerals Corp. |
| 1992 | Cyprus Mines Corporation transfers and assigns its then-existing talc operations to a newly created subsidiary, Cyprus Talc Corporation.<br>RTZ America, Inc. concurrently purchases 100% of the stock of Cyprus Talc Corporation. Cyprus Talc Corporation changes its name to Luzenac America, Inc. and Cyprus Windsor Minerals Corp. changes its name back to Windsor Minerals, Inc. |
| 2011 | **Rio Tinto America, Inc. (f/k/a RTZ America, Inc.) sells Luzenac America, Inc. and Windsor Minerals, Inc. to Imerys Minerals Holding Limited (UK) and QIT Fer & Titane (a member of the Rio Tinto Group) sells Luzenac, Inc. to Mircal, S.A.**<br>**Luzenac America, Inc., Windsor Minerals, Inc. and Luzenac Inc. – the three Debtors in these Chapter 11 Cases – change their names to ITA, ITV and ITC, respectively.** |

7

### C.    Overview of Debtors' Operations and Revenues

15.    The Debtors are in the business of mining, processing, selling, and/or distributing talc.  Talc is a hydrated magnesium silicate that is used in the manufacturing of dozens of products in a variety of sectors, including coatings, rubber, paper, polymers, cosmetics, food, and pharmaceuticals.  Talc is mined from talc deposits, which were geologically formed through the transformation of existing rocks under the effect of hydrothermal fluids carrying one or several of the components needed to form the mineral.  There are many types of talc and each ore body has its own features and its own geology.  Accordingly, the mining and processing of talc requires highly-technical and specialized knowledge.

16.    The Debtors' talc operations include talc mines, plants, and distribution facilities located in: Montana (Yellowstone, Sappington, and Three Forks); Vermont (Argonaut and Ludlow); Texas (Houston); and Ontario, Canada (Timmins, Penhorwood, and Foleyet).  The Debtors also utilize offices located in San Jose, California and Roswell, Georgia.  In 2018, North American talc sales were comprised of the following products: polymers (31%); paper (18%); paints and coatings (16%); specialties (16%); rubber (7%); personal care/cosmetics (5%); building materials (4%); and others (3%).  ITA and ITV sell talc directly to their customers as well as to third party and affiliate distributors.  ITC exports the vast majority of its talc into the United States almost entirely on a direct basis to its customers.[6]

17.    The Debtors' total revenue in 2018 was approximately $174 million.

### D.    Customers

18.    The Debtors' top customers in the personal care/cosmetic sector are manufacturers of baby powder (50% of personal care sales), makeup (30% of personal care sales),

---

[6]    A small portion of ITC's talc is sold to distributors in the United States.

US-DOCS\105945964.1

and soap (20% of personal care sales).  Although there are other talc suppliers in the market, the Debtors have historically been the sole supplier of cosmetic talc to J&J[7] and, therefore, have been routinely named as a co-defendant of J&J in litigation related to the Talc Claims.  Although personal care/cosmetic sales make up only approximately 5% of the Debtors' revenue, approximately 98.6% of the pending Talc Claims allege injuries based on use of cosmetic products containing talc.

19.    In the polymers sector, the Debtors' main customers include compounders, who generally sell products to original equipment manufacturers in the automotive industry.  The Debtors' other customers include, among others, manufacturers in the industrial coatings, paper, and catalysts industries.

### E.    Competitors

20.    The Debtors are the market leader with respect to talc production in North America, representing nearly 50% of the market.  The Debtors' main competitors are the following companies: Mineral Technologies Inc., American Talc Company, Inc., IMI Fabi, and Cimbar.

### F.    Shared Services

21.    The Debtors participate in certain shared services arrangements with other Imerys Group entities that are beneficial and/or necessary to their operations and permit the Debtors to access critical resources at reduced costs.  In particular, the Debtors participate in certain shared services along with other North American Imerys Group entities that permit the Debtors to access certain corporate and administrative services (the "**NA Shared Services**").  The

---

[7]    Prior to the sale of Windsor to Cyprus, J&J's talc sales were vertically integrated, with Windsor's Vermont operations supplying talc to J&J cosmetic manufacturing operations.

US-DOCS\105945964.1

NA Shared Services are generally governed by shared services agreements and are administered

by the USA Shared Service Center (the "**SSC**"), which is a unit of non-debtor Imerys USA, Inc.

("**Imerys USA**").  As further described in the Cash Management Motion,[8] ITA and ITV receive

NA Shared Services related to accounts payable, treasury, tax, facilities, cash application,

information technology, purchasing, logistics, human resources, and certain telecommunications

services.  ITC receives NA Shared Services related accounts payable, treasury, purchasing and

logistics services.  The Debtors are invoiced monthly, on a *pro rata* basis, for NA Shared Services

expenses based on an annual budget, which is adjusted based on actual costs.  The Debtors also

incur certain direct costs related to licensing fees, salary payments, and other charges.  The

expenses arising from the NA Shared Services are paid for by ITA on behalf of the Debtors, with

ITV's and ITC's portion of the payment recorded as an intercompany receivable on ITA's books.

22.    The Debtors also receive certain group-level executive management, legal,

and other corporate overhead services from non-debtor Parent.  Specifically, these services

include, among other things: business administration, marketing and sales, legal, internal and

external communications, technology, transport, and security services (the "**SA Shared**

**Services**").  Provision of the SA Shared Services is governed by separate Services Agreements

between the Debtors and non-debtor Parent.  The Debtors incur SA Shared Services expenses

totaling the *pro rata* share of the direct and indirect costs incurred by Imerys S.A. on behalf of

the Debtor, plus 5%, a portion of the related overhead costs, and direct costs for any expenses

incurred on the Debtors' behalf.  Aside from these shared services the Debtors also receive goods

---

[8]    The "Cash Management Motion" means the *Debtors' Motion for Orders Under 11 U.S.C. §§ 105(a), 345, 363, 503(b), and 507(a), Fed. R. Bankr. P. 6003 and 6004, and Del. Bankr. L.R. 2015-2 (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (II) Authorizing Continuation of Existing Deposit Practices, (III) Approving the Continuation of Intercompany Transactions, and (IV) Granting Superpriority Administrative Expense Status to Certain Postpetition Intercompany Claims.*

US-DOCS\105945964.1

and services pursuant to certain other intercompany transactions with the Debtors and other non-debtor affiliates that are further described in the Cash Management Motion.

### G.    Summary of Prepetition Debt

23.    <u>Funding</u>.  The Debtors are not party to any secured financing arrangements or any third party credit facilities, and instead have relied on the positive cash flow generated by their operations to run their businesses.  As described in detail in the Cash Management Motion, prior to the Petition Date, ITA and ITV participated in a zero balance accounting cash management system with their non-debtor, indirect parent, Imerys USA.  Under such system, at the end of each business day, funds remaining in ITA's lockbox bank account were automatically swept to Imerys USA's bank account.  Historically, Imerys USA paid the majority of ITA's and ITV's expenses directly, pursuant to certain intercompany arrangements, including payments to third parties such as vendors.  The amount of such payments were deducted from the amount of funds swept into Imerys USA's accounts from ITA each day.  The remaining amount was then recorded in ITA's and Imerys USA's books as an interest-bearing intercompany loan in favor of ITA pursuant to that certain Intercompany Loan and Investment Agreement, dated as of June 2018, by and between ITA and Imerys USA and that certain Intercompany Loan and Investment Agreement, dated as of June 2018, by and between ITV and Imerys USA (each as subsequently amended or revised).  In addition to reimbursing Imerys USA for amounts paid on behalf of ITA and ITV, in certain instances, ITA also directly paid ITA's and ITV's other expenses, including payroll, certain bank fees, and other occasional third party payments.[9]  To account for obligations paid by ITA on behalf of ITV, ITA recorded any such amounts on its books as an intercompany receivable from ITV and ITV recorded such amounts on its books as an intercompany payable to ITA.

---

[9]        ITV does not hold any bank accounts in its own name and utilizes ITA's bank accounts.

US-DOCS\105945964.1

24.     As ITA and ITV have been historically cash-flow positive, as of the Petition Date, ITA has an outstanding loan payable from non-debtor Imerys USA in the current amount of approximately $14,400,000.  ITV also has an outstanding loan payable from non-debtor Imerys USA in the current amount of approximately $2,900,000.

25.     Prior to the Petition Date, ITA and ITV modified certain aspects of their cash management system in anticipation of the Chapter 11 Cases.  ITA and ITV implemented these modifications in order to (i) ensure transparency in the Chapter 11 Cases by avoiding having a system in which Debtor funds were swept to a non-debtor affiliate on a daily basis and comingled with funds belonging to other non-debtor affiliates, and (ii) simplify their cash management system for the purposes of postpetition reporting and seeking first day relief.  Accordingly, prior to the Petition Date, ITA and ITV eliminated the practice of automatically sweeping funds to Imerys USA.  ITA's and ITV's funds are now retained in ITA's bank accounts, and ITA pays most of ITA's and ITV's third party and intercompany obligations from such accounts.  Due to the nature of ITA's and ITV's operations, however, non-debtor Imerys USA may continue to satisfy certain obligations (as discussed in Part 2 below) for the benefit of ITA and ITV, with ITA reimbursing non-debtor Imerys USA on account of such payments.  As under the prior cash management system, ITA continues to make payments on behalf of ITV, which are recorded on each entity's books as a receivable held by ITA and a payable due from ITV.

26.     ITC operates under a separate cash management system from the other Debtors.  Cash generated from ITC's operations is deposited in ITC's accounts and ITC pays its third party and intercompany obligations directly out of its bank accounts.  Historically, excess cash generated by ITC's operations was periodically swept to Parent at the discretion of ITC.  All transfers of cash that were made to Parent (net of any cash transfers made from Parent to ITC or

12

on behalf of ITC) were recorded as an intercompany interest-bearing loan on the books of Parent and ITC pursuant to an intra-group treasury agreement and that certain Intercompany Loan and Investment Agreement by and between Imerys S.A. and ITC.  As a result, as of the Petition Date, ITC holds an outstanding loan due and payable from non-debtor Parent in the amount of approximately $3,000,000.

27.    Prior to the Petition Date, ITC also modified its cash management system and eliminated the practice of periodically sweeping cash to Parent's account and instead now retains funds generated from operations in ITC's bank accounts.

28.    Bonds.  As described in detail in the Debtors' Insurance and Bonding Motion,[10] the Debtors are obligated under certain applicable statutes, rules, and regulations to post bonds to cover the costs of obligations related to the reclamation of the land on which their mines are located, as well as certain performance obligations, licenses/permits, customs and border protection obligations, and litigation appeals.  As of the Petition Date, there were seven bonds posted on behalf of ITA, one bond posted on behalf of ITV, and two bonds posted on behalf of ITC.   ITC paid the applicable surety directly on account of both of its bonding obligations.  ITA paid the applicable surety directly on account of the appeal bond.  The rest of the Debtors' bonding program is maintained on a consolidated basis by non-debtor Imerys USA.  Premiums for each of these bonds were paid by non-debtor Imerys USA for the benefit of the Debtors and the Debtors reimbursed Imerys USA for all fees and costs associated with such bonds.  As of the Petition Date, the total amount of bonds posted by or on behalf of the Debtors was approximately $51,000,000.

---

[10]    The "Insurance and Bonding Motion" means the *Debtors' Motion for Order Under 11 U.S.C. §§ 105(a), 362(b), and 503(b) Authorizing Debtor to (I) Pay Their Prepetition Insurance Obligations, (II) Pay Their Prepetition Bonding Obligations, (III) Maintain Their Postpetition Insurance Coverage, and (IV) Maintain Their Bonding Program.*

29.     <u>Letter of Credit Facility</u>.  Non-debtor Imerys USA is the obligor under a $50 million letter of credit facility with Credit Industriel et Commercial, dated as of March 1, 2017 (the "**LC Facility**"), for the benefit of ITV.  Under the LC Facility, three standby letters of credit have been issued, and are currently outstanding, for the benefit of ITV in the aggregate amount of approximately $410,000.  Non-debtor Imerys USA pays all costs related to the LC Facility directly and these costs are then charged back to ITV.

30.     <u>Trade Debt</u>.  In the ordinary course of their businesses, the Debtors incur trade debt with numerous vendors in connection with their mining, processing, and distribution of talc.  The Debtors are substantially current with respect to their unsecured trade debt, and do not believe they have material unsecured liabilities other than the Talc Claims, which are contingent and disputed.  The Debtors' unsecured trade debt over the past twelve months was approximately $11,700,000, on average, per month.

## II.     LITIGATION AND EVENTS LEADING TO THE CHAPTER 11 FILINGS

31.     As discussed in Part 1 above, one or more of the Debtors are among the defendants in thousands of actions brought before several U.S. federal and state courts by multiple plaintiffs asserting Talc Claims.  The Debtors believe this litigation is without merit and their strategy has consistently been to mount a vigorous defense to all such claims.  Given the increasing number of Talc Claims asserted, the rise in settlement demands in cosmetic talc lawsuits, and the increased unwillingness of the Debtors' insurers and third party contractual indemnitors to provide coverage for the Debtors' mounting defense costs and potential liability exposure, the Debtors determined that the commencement of these Chapter 11 Cases was their best option to protect their estates and preserve value for all stakeholders. The Debtors lack the financial wherewithal to remain in the tort system.

US-DOCS\105945964.1

A.    **Overview of Talc Litigation**

32.    Plaintiffs generally have asserted two types of Talc Claims: (1) claims alleging ovarian cancer or other gynecological diseases arising as a result of talc exposure (the "**OC Claims**") and (2) claims alleging respiratory cancers or other asbestos-related diseases arising as a result of talc exposure ("**Mesothelioma Claims**").  As of the Petition Date, there are approximately 13,800 pending alleged OC Claims and approximately 850 pending alleged Mesothelioma Claims.

33.    *OC Claims*.  Plaintiffs asserting OC Claims generally allege that they have developed ovarian cancer or other gynecological diseases as a result of their use of J&J body powder (which is comprised almost entirely of talc) for feminine hygiene purposes.  Historically, plaintiffs have asserted that talc itself causes ovarian cancer and have not asserted that talc contained in the body powder was contaminated with asbestos.  In 2017, however, some plaintiffs asserting OC Claims began to assert that their personal injuries also were caused by alleged asbestos contamination of the talc.  The Debtors dispute all of these allegations.

34.    At the time of the Imerys Group's acquisition of the Debtors in 2011, there was only one OC Claim pending against ITA, which was in the early stages of litigation.  ITA was dismissed from that case on summary judgment prior to trial in 2013, but co-defendant J&J was found liable for negligence (though no damages were awarded).  In early 2014, as a result of the publicity surrounding the J&J judgment, there was an influx of additional cases filed against both J&J and ITA.  Then, over the next several years, the number of OC Claims filed accelerated at an even more rapid pace.  Approximately 16,500 OC Claims have been filed since 2014 and, as of the Petition Date, approximately 13,800 OC Claims are still pending.

US-DOCS\105945964.1

35.    *Mesothelioma Claims*.  Plaintiffs asserting Mesothelioma Claims allege they have developed non-ovarian cancer personal injuries based on some form of asbestos exposure.  Some of these plaintiffs assert that they were only exposed to talc that was contaminated with asbestos, while others allege additional non-talc exposure to asbestos.  In many cases, plaintiffs have made insufficient allegations for the Debtors to determine whether the Mesothelioma Claims are based on cosmetic talc exposure, industrial talc exposure, or both.  For those pending cases where the plaintiff's exposure to talc has been identified with specificity, approximately 63% percent of plaintiffs allege exposure to asbestos through the use of cosmetics, while approximately 24% of plaintiffs allege exposure in industrial occupational settings (the approximately remaining 13% of plaintiffs allege both cosmetic and industrial exposure).

36.    At the time of the Imerys Group's acquisition of the Debtors in 2011, there were only approximately seven pending Mesothelioma Claims, which were all in the early stages of litigation.  As with OC Claims, however, plaintiffs began filing Mesothelioma Claims at an increasing pace in 2014.  Since 2014, approximately 1,200 claims have been filed, of which approximately 850 were still pending as of the Petition Date.

37.    As they have consistently argued during all such litigation, the Debtors maintain that their talc is safe, that the OC Claims and the Mesothelioma Claims are entirely without medical or scientific merit, and that exposure to their talc products has not caused any personal injuries.  The safety of the Debtors' talc has been confirmed by dozens of peer-reviewed studies and multiple regulatory and scientific bodies, including the FDA.  Three of the largest real-world studies ever conducted—one on talc miners over the course of 50 years and two of the largest studies of women's health ever conducted in the United States—have overwhelmingly confirmed that talc is not carcinogenic.  Moreover, the trial court supervising the coordinated talc

16

ovarian cancer litigation in New Jersey state court held that the scientific evidence of talc as an alleged cause of ovarian cancer was insufficient to allow selected bellwether cases in that court (approximately 286) to proceed to trial against ITA and J&J.  In addition, the trial court supervising the coordinated talc ovarian cancer litigation in California state court granted summary judgment to ITA before trial and then subsequently dismissed a multimillion dollar verdict against J&J in an ovarian cancer case, in part because of the limited nature of the scientific evidence presented at trial.  ITA has won outright three defense verdicts in its favor in jury trials in Missouri state court.  No final, unappealable verdict has been issued against any Debtor in a lawsuit asserting a Talc Claim.  The Debtors have been and continue to be committed to the quality and safety of their products above all else.  Nevertheless, the substantial increase in alleged Talc Claims in the last few years, combined with the current state of the U.S. tort system, has led to overwhelming projected litigation costs (net of insurance) that the Debtors cannot sustain in the long term.

38.    <u>Insurance/Indemnities</u>.  One or more of the Debtors have rights to the proceeds of insurance policies for both the OC Claims and the Mesothelioma Claims, and the Debtors continue to litigate and negotiate the scope of the potentially available insurance coverage. The Debtors are informed and believe that the total amount of insurance available for the OC Claims is at least $529 million and believe the total amount of insurance coverage for the Mesothelioma Claims is at least $180 million.[11]  The Debtors also believe that the Talc Claims related to the Debtors' sale of talc to J&J are subject to uncapped indemnity rights against J&J under various stock purchase and supply agreements.  One or more of the Debtors also have rights to the proceeds of insurance policies issued to J&J and its subsidiaries, and policies issued to

---

[11]    ITA currently is involved in coverage litigation in California state court regarding the scope and amount of available coverage for Mesothelioma Claims.

US-DOCS\105945964.1

Standard Oil and its subsidiaries, which the Debtors believe to have total limits of approximately slightly more than $3 billion.

39.     ***Ovarian Cancer Insurance***.  One or more of the Debtors have rights to seek insurance coverage under 14 primary liability policies issued by Zurich American Insurance Company ("**Zurich**") to Luzenac America or a Rio Tinto entity (both of which were prior owners of the Debtors as summarized in paragraph 13 above).  Zurich issued four primary liability policies to Luzenac America from May 1997 to May 2001 with total aggregate limits of liability of $20 million (the "**Luzenac Policies**").  Zurich issued ten primary liability policies to a Rio Tinto entity (and its subsidiaries) from May 2001 to May 2011 with total aggregate limits of $480 million (the "**Rio Tinto Policies**," and together with the Luzenac Policies, the "**Zurich Policies**").  As of the Petition Date, the Debtors are informed and believe that the Zurich Policies have total remaining limits of approximately $492 million.  Pursuant to various agreements with Zurich and Rio Tinto, the Debtors owe no further deductibles on the Zurich Policies.  The Debtors are unaware of any excess policies issued to Rio Tinto or to the Debtors when owned by Rio Tinto.  Each of the Zurich Policies contains an endorsement that purports to exclude coverage for injuries caused by exposure to asbestos.

40.     One or more of the Debtors also have rights to insurance coverage under four primary general liability policies and four umbrella polices issued by XL Insurance America, Inc. ("**XL**") to Imerys USA and its subsidiaries.  XL issued primary general liability policies for the period of January 2011 to January 2015 with total aggregate limits of $4 million (the "**XL Primary Policies**").  XL also issued umbrella liability policies for the period of January 2011 to January 2015 with total aggregate limits of $34 million (the "**XL Umbrella Policies**," and together with the XL Primary Policies, the "**XL Policies**").  As of the Petition Date, the Debtors are

18

informed and believe that the XL Policies have total remaining limits of approximately $37 million.  Each of the XL Policies contains an endorsement that purports to exclude coverage for injuries caused by exposure to asbestos.

41.    ***Mesothelioma Insurance***.  As a result of the various transactions involving the talc business of Cyprus as noted above in paragraph 13, ITA has the right to seek proceeds from insurance policies that provide coverage for liabilities arising out of the talc business of Cyprus.  As of the Petition Date, the Debtors are informed and believe that all of the primary liability policies that could provide coverage for asbestos-related liabilities arising out of the talc business of Cyprus have been exhausted, except four primary liability policies issued by The American Insurance Company from May 1961 to October 1964.  The remaining coverage consists of umbrella and excess policies issued by various insurers from April 1962 to July 1986 with total aggregate limits of approximately $180 million.  The Debtors are informed and believe that ITA also has rights to seek the proceeds from insurance policies issued to Standard Oil (Indiana) (which was an indirect prior owner of the Debtors as summarized in paragraph 14 above) from 1980 to 1985 with total aggregate limits of approximately $1.2 billion.  As of the Petition Date, the Debtors lack knowledge as to the remaining and available limits of the policies issued to Standard Oil (Indiana).

42.    ***J&J Insurance***.  One or more of the Debtors have the right to seek proceeds from various insurance policies issued to J&J and its subsidiaries with total aggregate limits of approximately $2 billion.  As of the Petition Date, the Debtors lack knowledge as to the total remaining and available limits of the insurance policies issued to J&J and its subsidiaries.

43.    Despite this seemingly robust insurance coverage, the Debtors have determined that it is no longer feasible for them to continue to litigate the Talc Claims.  While the

19

Debtors have access to numerous insurance policies, coverage is not available for all claims.  For example, where a claimant's alleged date of first exposure to talc occurs after a certain date, the claim may not be covered under some of the insurance policies.[12]  In addition, some policies only provide coverage for non-asbestos related injuries, and punitive damages often are not covered by insurance.  The Debtors, in consultation with their insurance coverage counsel, have thoroughly analyzed their various insurance policies and determined that currently available insurance coverage for certain cosmetic talc-related litigation may be exhausted in the first half of 2019.

44.      ***J&J Indemnity***.  One or more of the Debtors also have certain indemnity rights against J&J or one of its affiliates for OC Claims and Mesothelioma Claims.  For example, under a 1989 stock purchase agreement pursuant to which the Debtors purchased the entity known today as ITV, J&J agreed to indemnify one or more of the Debtors for all liabilities arising out of use or exposure to talc-containing products supplied to J&J prior to the January 6, 1989 closing date.  In addition, under various talc supply agreements, J&J agreed to indemnify one or more of the Debtors for all liabilities arising out of the supply of talc to J&J during the term of the supply agreements.

45.      While the Debtors have additional protection from the Talc Claims through these indemnification agreements with J&J and its affiliates, the Debtors' ability to recover under these indemnification agreements in a timely fashion is uncertain.  As of the Petition Date, J&J has refused to acknowledge or accept its indemnification obligations and has disputed the scope of coverage available to the Debtors under these agreements (or denied indemnification

---

[12]      Under the standard asbestos exclusion in the United States, insurance policies do not cover asbestos liability where a claimant's first exposure occurred after 1986.  In addition, certain of the Debtors' insurance policies do not cover OC Claims where a claimant's first exposure is alleged to have occurred after 2015.

altogether).  As such, the Debtors' recovery under these indemnification agreements has been significantly delayed.

### B.    Prepetition Negotiations

46.    As a result of the increasing talc litigation and the unwillingness of the Debtors' insurers and indemnitors to provide coverage for the Debtors' mounting defense costs, the Debtors retained Latham & Watkins LLP ("**Latham**") in June 2018 to assist the Debtors in evaluating a number of strategic options.  The Debtors and Latham worked with the Debtors' litigation defense counsel, Alston & Bird LLP and Gordon, Rees, Scully, Mansukhani, LLP, and insurance coverage counsel, Neal, Gerber & Eisenberg LLP, to identify and assess alternatives to resolve the Talc Claims, including the costs and benefits associated with continued litigation of the Talc Claims in the tort system

47.    At the same time, the Debtors explored the viability of using Chapter 11 to address these Talc Claims by channeling them to a trust created under Sections 105 and 524(g) of the Bankruptcy Code that would be structured to ensure fair and equitable treatment of present and future claimants.  As part of this exploratory effort and to facilitate the implementation of this potential Chapter 11 strategy if and when authorized by their boards of directors, the Debtors entered into an engagement letter with James L. Patton, Jr. of Young, Conaway, Stargatt & Taylor, LLP ("**Young Conaway**") on September 25, 2018 to serve as a proposed future claims representative (the "**Proposed FCR**") to represent the interests of individuals who may in the future assert talc-related demands against the Debtors.  The Proposed FCR retained Young Conaway as counsel and Ankura Consulting Group, LLC as claims analyst to provide advice in connection with such representation.  Together with his advisors, the Proposed FCR initiated an extensive diligence process into the Debtors' businesses and the pending talc litigation, subject

21

to a confidentiality agreement. The Debtors have worked constructively with the Proposed FCR and his advisors throughout this process by providing access to a fulsome data room and responses to numerous information requests, as well as by attending multiple in-person diligence meetings, among other things. The Debtors had hoped to engage with plaintiffs firms prior to the commencement of these Chapter 11 Cases to determine if a pre-arranged chapter 11 plan could be achieved. The Debtors did not have sufficient time, however, to conduct the diligence process that would be necessary for the parties to engage in meaningful discussions given the pending trial calendar (and risk of incurring a judgment for which the Debtors could not post an appeal bond) and the ever-increasing costs of settlement and defense. Nevertheless, the constructive discussions with the Proposed FCR confirmed, from the Debtors' perspective, the viability of using Chapter 11 to resolve the Talc Claims in a manner that will maximize the distributable value for all stakeholders and will provide fair and equitable treatment of the Talc Claims.

48.     After extensive discussions with their advisors, the Debtors ultimately determined that, due to the increasing number of Talc Claims asserted and the prospect of diminishing, readily accessible insurance/third party indemnitor coverage, continued litigation in the tort system was not a viable option and that the commencement of these Chapter 11 Cases was in the best interests of the Debtors, their estates and their stakeholders. Accordingly, on February 13, 2019, the Debtors' boards of directors authorized the filing of these Chapter 11 Cases.

49.     The Debtors intend to seek the appointment of Mr. Patton as the future claimants' representative. Given the knowledge of the Debtors' businesses and claims that Mr. Patton gained during the prepetition diligence process, the Debtors believe his appointment will result in efficiencies that benefit creditors and the estates.

US-DOCS\105945964.1

50.     During the Chapter 11 Cases, the Debtors intend to negotiate the terms of a consensual plan of reorganization with the future claimants' representative appointed by the Court, representatives of the holders of current alleged Talc Claims and the non-debtor Parent on behalf of the rest of the Imerys Group in order to resolve the Talc Claims and develop a go-forward strategy for the affected talc businesses.  The Debtors are confident that such negotiations will culminate in a court-approved consensual plan of reorganization in the first half of 2020 and enable the Debtors to emerge free and clear of all their U.S. historic talc-related liabilities.

## PART 2

51.     In furtherance of the objective of preserving value for all stakeholders, the Debtors have sought approval of the First Day Pleadings and related orders (the "**Proposed Orders**"), and respectfully request that the Court consider entering the Proposed Orders granting such First Day Pleadings.  For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Pleadings.

52.     I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimum interruptions and disruptions to their businesses or loss of productivity or value and (b) constitutes a critical element in the Debtors' being able to successfully maximize value for the benefit of their estates.

23

# I. ADMINISTRATIVE AND PROCEDURAL PLEADINGS

## A. Joint Administration Motion[13]

53.    By the Joint Administration Motion, the Debtors seek entry of an order directing the joint administration of their three Chapter 11 Cases for procedural purposes only. Many of the motions, hearings, and other matters involved in the Chapter 11 Cases will affect the Debtors.  Thus, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders, and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.

## B. Motion to Limit Notice and Approve Notice Procedures[14]

54.    In the Motion to Limit Notice and Approve Notice Procedures, the Debtors request entry of an order (i) authorizing the Debtors to file (a) a consolidated master list of creditors, (b) a consolidated list of the top thirty law firms with the most significant Talc Claimant (as defined in the Motion to Limit Notice and Approve Notice Procedures) representations, and (c) a consolidated list of creditors holding the thirty largest unsecured claims (excluding Talc Claims), and (ii) approving the implementation of certain notice procedures for the Talc Claimants.

### i. Consolidated Master List

55.    In the Motion to Limit Notice and Approve Notice Procedures, the Debtors seek authorization to file a consolidated master list of creditors in lieu of requiring each Debtor to submit a Debtor-specific creditor matrix as provided the Local Rules of the Bankruptcy Practice

---

[13]    "**Joint Administration Motion**" means *Debtors' Motion for Order Under Fed. R. Bankr. P. 1015 and Del. Bankr. L.R. 1015-1 Authorizing Joint Administration of Chapter 11 Cases.*

[14]    "**Motion to Limit Notice and Approve Notice Procedures**" means the *Debtors' Motion for Order (I) Authorizing the Filing of (A) A Consolidated Master List of Creditors, (B) A Consolidated List of the Top Thirty Law Firms Representing Talc Claimants, and (C) A Consolidated List of Creditors Holding the Thirty Largest Unsecured Claims, and (II) Approving Certain Notice Procedures for Talc Claimants.*

US-DOCS\105945964.1

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"). The Debtors have identified thousands of entities to which notice of certain proceedings in the Chapter 11 Cases must be provided. Except for the contact information of the Talc Claimants (as described below), the Debtors (or their agents) presently maintain records containing the names and addresses of their respective creditors that are entitled to receive notices and other documents in the Chapter 11 Cases. I believe that this information may be consolidated and utilized efficiently to provide interested parties with notices and other similar documents as contemplated by the Local Rules on a consolidated basis. I believe that requiring each Debtor to submit a Debtor-specific matrix would be an unnecessarily burdensome and costly task and would likely result in duplicate mailings.

> ii.   **Consolidated List of Thirty Law Firms With the Most Significant Talc Claimant Representations**

56.     By the Motion to Limit Notice and Approve Notice Procedures, the Debtors also seek authorization to file a consolidated list of the top thirty law firms representing the most significant Talc Claimants as determined by the volume, scope and magnitude of Talc Claims asserted against the Debtors, and certain other related factors. As described herein, one or more of the Debtors is currently named as a defendant in pending Talc Claim litigation. Taken in the aggregate, the vast majority of the Debtors' known creditors are Talc Claimants (though, as noted above, the Debtors vigorously dispute all liability as to the Talc Claims). The Debtors' primary goal in filing the Chapter 11 Cases is to confirm a consensual plan of reorganization pursuant to sections 105(a), 524(g), and 1129 of the Bankruptcy Code that channels all of the present and future Talc Claims to a trust vested with substantial assets and provides for a channeling injunction prohibiting claimants from asserting against any Debtor or non-Debtor affiliate any claims arising from talc mined, produced, sold, or distributed by any of the Debtors prior to their emergence from

the Chapter 11 Cases.  While the Debtors dispute all liability as to the Talc Claims, I believe this approach will provide fair and equitable treatment of all stakeholders.  As a result, the Debtors anticipate that the Office of the United States Trustee (the "**U.S. Trustee**") will appoint an official committee of tort claimants comprised of the predominant plaintiffs' firms representing the Talc Claimants to represent the interests of the Talc Claimants in the Chapter 11 Cases.

57.     I do not believe that listing the individual Talc Claimants with the largest unsecured claims against the Debtors would facilitate the U.S. Trustee's appointment of a tort claimants creditors' committee.  Tort claimants' committees are typically comprised of the primary plaintiffs' firms that represent plaintiffs in pending litigation and not the individual tort claimants. In addition, I believe that  attempting to designate certain individual Talc Claimants as holding the "largest" unsecured claims would be arbitrary, where the pending Talc Claims are disputed, contingent and/or unliquidated.  I believe that providing the U.S. Trustee with a list of the top thirty law firms with the most significant Talc Claimant representations as determined by the volume of pending Talc Claims, the scope and magnitude of Talc Claims asserted against the Debtors, and related factors, would better assist the U.S. Trustee in forming such a committee.

### iii.     Consolidated List of Creditors Holding the Thirty Largest Unsecured Claims

58.     By the Motion to Limit Notice and Approve Notice Procedures, the Debtors also seek to file a consolidated list of creditors holding the thirty largest unsecured claims (excluding Talc Claimants).  I have been informed that pursuant to the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), a chapter 11 debtor must file with its voluntary petition a list setting forth the names, addresses, and claim amounts of the creditors, excluding insiders, that hold the twenty largest unsecured claims in the debtor's case (a "**Top Twenty List**").

26

59.     I believe that a consolidated list of the Debtors' top thirty unsecured creditors will be more useful to the U.S. Trustee than separate Top Twenty Lists for each Debtor. First, I believe that the individual Top Twenty Lists for each Debtor would likely overlap.  Second, I understand that the Debtors have very few unsecured creditors that are not Talc Claimants and claims held by the Debtors' trade creditors are minimal in comparison to the Talc Claims.  Finally, and as discussed above, the Debtors are also proposing to file a list of the top thirty law firms with the most significant Talc Claimant representations as determined by the volume of pending Talc Claims, the scope and magnitude of Talc Claims asserted against the Debtors, and related factors.

iv.     **The Talc Claimant Notice Procedures**

60.     In the Motion to Limit Notice and Approve Notice Procedures, the Debtors also seek to implement the certain notice procedures (the "**Notice Procedures**") by which the Debtors will (a) list the addresses of known counsel of record for the Talc Claimants, in lieu of the addresses of the Talc Claimants themselves, on the Debtors' creditor matrix and (b) send required notices, mailings, and other communications related to the Chapter 11 Cases to such known counsel of record for the Talc Claimants in lieu of sending such communications to the Talc Claimants themselves in the manner required pursuant to otherwise applicable noticing procedures in effect in the Chapter 11 Cases.

61.     In addition, I understand that throughout the course of the Chapter 11 Cases, various notices, mailings, and other communications will need to be sent to the Talc Claimants. In order to ensure that these claimants receive proper and timely notice of filings and critical events in the Chapter 11 Cases, the Debtors request authority to direct the Claims Agent to send required notices, mailings, and other communications to the counsel of record for the Talc Claimants, in the manner required pursuant to otherwise applicable noticing procedures in effect in the Chapter 11 Cases, *provided* that the Debtors will (or direct the Claims Agent to) send required notices,

27

mailing and other communications directly to any Talc Claimants who so request  such direct notice from the Debtors in writing.[15]

62.    I believe that by implementing the Notice Procedures, the actual notice that Talc Claimants will receive via their counsel will be superior to the notice that the Talc Claimants would receive if the Debtors were to attempt to deliver notices and other communications directly to such claimants.  In addition, I understand that the address for counsel to the Talc Claimants is more likely to remain unchanged over time, and hence providing notice to the counsel of record will allow for more accurate notice to Talc Claimants.   Moreover, I believe that the Notice Procedures will also significantly ease the Debtors' administrative burden of sending notices to thousands of Talc Claimants, resulting in a more cost-effective notice procedure that benefits the Debtors' estates and creditors.

### C.    Motion to Enforce and Confirm Automatic Stay[16]

63.    By the Motion to Enforce and Confirm Automatic Stay, the Debtors seek entry of an order enforcing the protections of sections 362, 365, 525, and 541(c) of the Bankruptcy Code to aid in the administration of the Chapter 11 Cases and to help ensure that the global operations of the Debtors and their non-Debtor affiliates are not disrupted.

64.    I believe that notwithstanding the self-executing and global nature of sections 362, 365, 525, and 541 of the Bankruptcy Code, not all parties affected, or potentially affected, by the commencement of the Chapter 11 Cases are aware of these statutory provisions

---

[15]    Additionally, for those law firms representing multiple Talc Claimants, by the Motion to Limit Notice and Approve Notice Procedures, the Debtors seek authorization to serve each document only a single time on such law firms (at each relevant address) on behalf of all such counsel's clients, *provided that* any notice or other document relating specifically to one or more particular Talc Claimants (rather than all Talc Claimants represented by such law firm) shall clearly identify such parties.

[16]    "**Motion to Enforce and Confirm Automatic Stay**" means the *Debtors' Motion for Order Under 11 U.S.C. § 105 Enforcing the Protections of 11 U.S.C. §§ 362, 363, 365, 525, and 541(c).*

Case 19-10289-LSS Doc 1361-4 Filed 04/27/20 Page 35 of 84 Case 1:19-cv-01818-CFC Document 14-2 Filed 04/28/20 Page 291 of 547 PageID #: 870

Exhibit C - Part 4 of 5 Nolan Decl    Page 35 of 84

or their significance and impact.   Therefore, I believe it is it is prudent to obtain an order confirming and reinforcing the relevant provisions of the aforementioned sections of the Bankruptcy Code.

65.    I believe that the requested relief is particularly appropriate because the Debtors and their non-Debtor affiliates and subsidiaries operate, purchase materials, and record sales in numerous countries with different legal systems, including without limitation, Canada, Italy, France, China, India, Belgium, the United Kingdom, Korea, and Austria.   The Debtors engage with numerous foreign customers, suppliers, and other vendors, as well as foreign regulators and other governmental units.   Moreover, many of the Debtors' key contracts are governed by the laws of foreign jurisdictions.   I also believe that, absent an order from this Court, parties might attempt to take improper actions against the Debtors or property of their estates. Accordingly, I believe, that granting the relief requested in the Motion and Order to Enforce and Confirm Automatic Stay is in the best interests of the Debtors, their estates, and their creditors.

### D.    Motion Appointing a Foreign Representative[17]

66.    By the Motion Appointing a Foreign Representative, the Debtors seek entry of an order authorizing ITC to act as the foreign representative on behalf of the Debtors' estates in any judicial or other proceedings in Canada.

67.    As further described herein, in addition to their operations in the United States, the Debtors have certain assets and operations in Canada.   ITC is incorporated in Canada and is an affiliate of the other Debtors in the Chapter 11 Cases.   ITC, as the proposed Foreign Representative (as defined below), will shortly seek ancillary relief in Canada on behalf of the

---

[17]    "**Motion Appointing A Foreign Representative**" means the *Debtors' Motion for Order Pursuant to 11 U.S.C. § 1505 Authorizing Imerys Talc Canada Inc. to Act as Foreign Representative*.

Debtors, pursuant to the Companies' Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36 as amended (the "**CCAA**") in the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") in Ontario, Canada.  The purpose of the ancillary proceedings (the "**Canadian Proceedings**") is to request that the Canadian Court recognize the Chapter 11 Cases as a "foreign main proceeding" under the applicable provisions of the CCAA in order to, among other things, protect the Debtors' assets and operations in Canada.

68.    To commence the Canadian Proceedings, the Debtors or another third party needs authority to act as the "foreign representative" on behalf of the Debtors' estates (the "**Foreign Representative**") and, therefore, the Debtors seek to appoint ITC as such Foreign Representative.  I understand that for ITC to be recognized as the Foreign Representative of the Debtors in the Canadian Proceedings, and thereby apply to have the Chapter 11 Cases recognized by the Canadian Court, this Court must enter the Order authorizing ITC to act as the Foreign Representative in the Canadian Proceedings.  I understand that if the Order is granted, ITC will be able to file the Order with the Canadian Court as the instrument authorizing ITC to act as the Foreign Representative pursuant to section 46 of the CCAA.

E.    **Retention Applications**

69.    I believe that the retention of chapter 11 professionals is essential to the Chapter 11 Cases.  Accordingly, during the Chapter 11 Cases, the Debtors anticipate that they will request permission to retain, among others, the following professionals: (a) Latham, as co-counsel; (b) Richards, Layton & Finger, P.A., as co-counsel; (c) Prime Clerk LLC, as claims and noticing agent and administrative advisor; (d) A&M, as financial advisor; (e) Neal, Gerber & Eisenberg LLP, as special insurance and indemnification litigation counsel; (f) KCIC, LLC, as insurance and valuation consultant; and (g) Stikeman Elliot LLP, as Canadian counsel.  I believe that the above

30

Case 19-10289-LSS    Doc 88    Filed 04/27/18    Page 37 of 84
Case 1:19-cv-01189-CCC-EB    Document 104-2    Filed 04/18/19    Page 31 of 37    PageID #: 872
Exhibit C - Part 4 of 5 Nolan Decl    Page 37 of 84

professionals are well-qualified to perform the services contemplated by their various retention applications, the services are necessary for the success of the Chapter 11 Cases, and the professionals will coordinate their services to avoid duplication of efforts.  I understand that the Debtors may find it necessary to seek retention of additional professionals as the Chapter 11 Cases progress.

## II.    BUSINESS OPERATION MOTIONS

### A.  Cash Management Motion[18]

70.    By the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system, including maintenance of their existing bank accounts, checks, and business forms; (ii) granting the Debtors a waiver of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with the Debtors' practices under their existing cash management system or other actions described herein; (iii) authorizing, but not directing, the Debtors to continue to maintain and use their existing deposit practices notwithstanding the provisions of section 345(b) of the Bankruptcy Code; (iv) approving the continuation of the Intercompany Transactions (as defined below); (v) authorizing the Debtors to open and close bank accounts; and (vi) according superpriority administrative expense status to postpetition intercompany claims arising from transactions among the Debtors.

---

[18]    "**Cash Management Motion**" means *Debtors' Motion for Orders Under 11 U.S.C. §§105(a), 345, 363, 503(b), and 507(a), Fed. R. Bankr. P. 6003 and 6004, and Del. Bankr. L.R. 2015-2 (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (II) Authorizing Continuation of Existing Deposit Practices, (III) Approving the Continuation of Intercompany Transactions, and (IV) Grating Superpriority Administrative Expense Status to Certain Postpetition Intercompany Claims.*

31

### i.   The Debtors' Cash Management System and the Bank Accounts

71.   The Debtors oversee the collection, disbursement, and movement of cash generated from their operations through a cash management system (the "**Cash Management System**") that manages the Debtors' cash inflows and outflows through a number of bank accounts.  I believe that the Cash Management System is critical to the Debtors' operations as it enables the Debtors to, among other things, (i) monitor cash receipts and ensure payment of necessary disbursements, (ii) track various intercompany transfers and transactions with other Debtors and Non-Debtor Affiliates, and (iii) ensure accurate cash forecasting and reporting.  I understand that the Cash Management System has been in place since the Debtors' operations were acquired by the Imerys Group in 2011.

72.   The Cash Management System consists of segments relating to (i) ITA and ITV (the "**USA Cash Management System**") and (ii) ITC (the "**ITC Cash Management System**").  A diagram depicting the Cash Management System as of the Petition Date, including ordinary course transfers between the Bank Accounts (as further described and defined below), is attached as Attachment 1 to the Cash Management Motion.  A schedule of the Debtor Bank Accounts and the Imerys USA Bank Accounts (each as further described and defined below) is attached to the Cash Management Motion as Attachment 2.

73.   As of the Petition Date, the Debtors maintain four bank accounts (the "**Debtor Bank Accounts**"):

#### 1.   ITA Bank Accounts

74.   ITA maintains two bank accounts in its name in the United States at SunTrust Bank (the "**ITA Bank Accounts**").  The ITA Bank Accounts are used by both ITA and

US-DOCS\105945964.1

ITV to manage cash related to their day-to-day operations.[19]  One of the ITA Bank Accounts is a lockbox account that receives ITA and ITV funds via incoming checks, wires, ACH transfers, and electronic funds transfers from third parties, including customers, as well as incoming payments on account of Intercompany Transactions (the "**ITA Lockbox Account**").  As of the Petition Date, the ITA Lockbox Account held cash totaling approximately $7,600,000.  The other ITA Bank Account is used to fund disbursements incurred by ITA and ITV via checks, wires, ACH transfers, or electronic funds transfers (the "**ITA Disbursement Account**"), including, among others, vendor, utility, and lease payments, employee payroll, expense reimbursements, and intercompany expenses incurred on account of Intercompany Transactions.

### 2. ITC Bank Accounts

75.     ITC maintains two bank accounts in its name in Canada (the "**ITC Bank Accounts**") at Royal Bank of Canada ("**RBC**" and, together with SunTrust Bank, the "**Banks**").  The ITC Bank Accounts are both operating accounts that are used for receiving funds earned from ITC's operations and disbursing funds to pay third party and intercompany obligations via checks, wires, ACH transfers, and electronic funds transfers.  ITC regularly transacts business in both U.S. Dollars and Canadian Dollars.  Accordingly, one of the ITC Bank Accounts is used solely for transactions conducted in U.S. Dollars (the "**ITC USD Account**"), and the other ITC Bank Account is used solely for transactions conducted in Canadian Dollars (the "**ITC CAD Account**").  As of the Petition Date, the ITC Bank Accounts held cash totaling approximately $3,400,000 USD.

76.     In the ordinary course of business, the Banks charge, and the Debtors pay, honor, or allow to be deducted from the appropriate Debtor Bank Accounts, certain service charges and other fees, costs, and expenses charged by the Banks (collectively, the "**Bank Fees and**

---

[19]     ITV does not hold any bank accounts in its own name and utilizes the ITA Bank Accounts.

US-DOCS\105945964.1

**Expenses**").  The Bank Fees and Expenses currently average approximately $6,000 per month in the aggregate. The Debtors estimate that approximately $9,250 of accrued but unpaid Bank Fees and Expenses are outstanding as of the Petition Date.

### 3.Non-Debtor Affiliate Bank Accounts

77.    There are four bank accounts held by certain Non-Debtor Affiliates that are particularly relevant to the Debtors' Cash Management System and are therefore described herein (the "**Non-Debtor Affiliate Bank Accounts**" and together with the Debtor Bank Accounts, the "**Bank Accounts**").[20]

78.    Non-Debtor Imerys USA maintains two Non-Debtor Affiliate Bank Accounts in its name in the United States (the "**Imerys USA Bank Accounts**").  The first Imerys USA Bank Account is a concentration account that pools incoming funds from Imerys USA's subsidiaries (including, historically, although not presently, Debtors ITA and ITV) pursuant to a zero-balance account system (the "**USA ZBA Account**").  The second Imerys USA Bank Account is a controlled disbursement account that is used to fund certain intercompany and third party payments on behalf of ITA, ITV, and other Non-Debtor Affiliates that are subsidiaries of Imerys USA (the "**USA Disbursement Account**").  The Imerys USA Bank Accounts are both denominated in U.S. Dollars.

79.    Non-Debtor Imerys S.A. holds two Non-Debtor Affiliate Bank Accounts in its name in France that were previously related to the ITC Cash Management System (the "**Imerys S.A. Bank Accounts**").  One is an account for funds in U.S. Dollars (the "**Imerys S.A. USD Account**") and the other is an account for funds in Canadian Dollars (the "**Imerys S.A. CAD**

---

[20]    Additional bank accounts held by Non-Debtor Affiliates are not described in the Cash Management Motion.

Case 19-10289-LSS   Doc 864-3   Filed 04/27/18   Page 41 of 84
Case 1:19-cv-00583-CCC-HBO   Document 104-7   Filed 04/19/21   Page 651 of 735   PageID #: 876
Exhibit C - Part 4 of 5 Nolan Decl   Page 41 of 84

**Account**").  Historically, ITC periodically swept up funds from the ITC Bank Accounts to the applicable Imerys S.A. Bank Account, as further described below.

### ii.   The USA Cash Management System

80.     Previously, ITA and ITV utilized an alternative cash management system (the "**Previous USA Cash Management System**").  Under the Previous USA Cash Management System, the ITA Bank Accounts were part of a zero-balance accounting, or ZBA, system with the Imerys USA Bank Accounts.  Under this ZBA system, at the end of each business day, all funds in the ITA Lockbox Account were swept up to the USA ZBA Account.  Funds in an amount necessary to meet the daily funding needs of ITA and ITV were then automatically transferred at the end of each business day from the USA ZBA Account to either the USA Disbursement Account or to the ITA Disbursement Account.  Historically, non-Debtor Imerys USA used funds in the USA Disbursement Account to pay the majority of ITA and ITV's expenses, including payments to third parties such as vendors.  ITA and ITV reimbursed Imerys USA by setting off amounts paid on behalf of ITA's and ITV's expenses against the outstanding loan owed by Imerys USA to ITA (described below).  These transactions were recorded in ITA's and Imerys USA's books.  In certain instances, ITA used the ITA Disbursement Account to directly pay ITA's and ITV's other expenses, including payroll, certain bank fees, and other occasional third party payments.  To account for obligations paid by ITA on behalf of ITV, ITA recorded any such amounts on its books as an intercompany receivable from ITV, and ITV recorded such amounts on its books as an intercompany payable to ITA.

81.     Funds held in the Imerys USA Bank Accounts on account of ITA and ITV, after deducting disbursements made on behalf of ITA and ITV, were recorded as an interest-bearing intercompany loan in favor of ITA.  As of the Petition Date, ITA has an outstanding loan

payable from Imerys USA in the current amount of approximately $14,400,000, pursuant to that certain Intercompany Loan and Investment Agreement dated as of June 2018 by and between ITA and Imerys USA and that certain Intercompany Loan and Investment Agreement dated as of June 2018 by and between ITV and Imerys USA.  ITV also has an outstanding payable from Imerys USA in the current amount of approximately $2,900,000.

82.    Prior to the Petition Date, ITA and ITV modified certain aspects of the Previous USA Cash Management system in anticipation of the Chapter 11 Cases.  ITA and ITV implemented these modifications in order to (i) ensure transparency in the Chapter 11 Cases by avoiding having a system in which Debtor funds were swept to a Non-Debtor Affiliate Bank Account on a daily basis and commingled with funds belonging to other Non-Debtor Affiliates, and (ii) simplify the USA Cash Management System for the purposes of postpetition reporting and seeking first day relief.

83.    Accordingly, prior to the Petition Date, ITA and ITV eliminated the practice of automatically sweeping funds in the ITA Lockbox Account to the USA ZBA Account.  Now, ITA's and ITV's funds are retained in the ITA Lockbox Account.  ITA transfers funds from the ITA Lockbox Account to the ITA Disbursements Account on an as-needed basis to satisfy most of ITA's and ITV's expenses, including intercompany obligations.  Due to the nature of ITA's and ITV's operations, after the Petition Date, non-Debtor Imerys USA may continue to satisfy certain obligations for the benefit of ITA and ITV.  Following the Petition Date, ITA intends to pay reimbursements owed to Imerys USA on account of such payments directly in cash.

84.    Historically, most of the intercompany obligations by and between the Imerys Group entities (including ITA and ITV) were not immediately paid in cash and were

36

instead "netted out" at the end of each month.[21]  As of the Petition Date, ITA and ITV no longer intend to net out obligations with the Non-Debtor Affiliates.  Instead, ITA and ITV will satisfy intercompany obligations as they come due in cash and Non-Debtor Affiliates will similarly satisfy obligations to ITA and ITV as they come due in cash.  Payables and receivables may continue to accumulate among the Debtors, however, with such obligations to be settled on a cash basis at the Debtors' discretion.

### iii.    The ITC Cash Management System

85.    ITC's operations are managed through the ITC Cash Management System. Cash generated from operations is deposited in the ITC CAD Account or the ITC USD Account depending on the currency (ITC may also transfer funds between the ITC CAD Account and the ITC USD Account to cover disbursement needs).  Historically, excess cash generated by ITC's operations was periodically swept from the ITC Bank Accounts to the Imerys S.A. Bank Accounts at the discretion or consent of ITC.   As of the Petition Date, excess funds are no longer swept from the ITC Bank Accounts to Imerys S.A. Bank Accounts.  Instead, all funds generated from ITC's operations are retained in the ITC Bank Accounts.

86.    Cash amounts swept from the ITC Bank Accounts to the Imerys S.A. Bank Accounts prior to the Petition Date (net of any cash transfers made from Imerys S.A. to ITC or on behalf of ITC) were recorded as an intercompany interest-bearing loan on the books of Imerys S.A. and ITC.  As a result, as of the Petition Date, ITC holds an outstanding loan due and payable

---

[21]    For example, if in one month ITA bought goods for $70,000 from an Imerys Group entity, and the same Imerys Group entity incurred expenses totaling $60,000 for services provided to it by ITA in that same month, the net $10,000 balance owed by ITA would be reflected on ITA's books as a payable from ITA to the Imerys Group entity.  Periodically, Imerys USA, on ITA's and ITV's behalf, would settle outstanding intercompany payables or receivables held by ITA or ITV by either increasing or reducing ITA's outstanding intercompany loan.

from non-Debtor Imerys S.A. in the amount of approximately $3,000,000 pursuant to that certain Intra-Group Treasury Agreement by and between Imerys S.A. and certain of its affiliates.

87.    ITC disburses funds to satisfy outstanding third party and intercompany obligations from the applicable ITC Bank Account as they come due.  However, similar to ITA and ITV under the Previous USA Cash Management System, intercompany obligations by and between ITC and other Imerys Group entities were historically netted out and recorded on the relevant entity's books as a payable or receivable, as applicable, instead of being paid immediately in cash.  On a periodic basis, Imerys S.A. would settle, on ITC's behalf, outstanding intercompany payables or receivables held by ITC by either increasing or reducing ITC's outstanding loan receivable due from Imerys S.A.  As of the Petition Date, ITC no longer intends net out obligations with the Non-Debtor Affiliates.  Instead, ITC will satisfy intercompany obligations with the Non-Debtor Affiliates as they come due in cash and the Non-Debtor Affiliates will similarly satisfy obligations to ITC as they come due in cash.  However, payables and receivables may continue to accumulate among the Debtors, with such obligations to be settled on a cash basis at the Debtors' discretion.

      **iv.    Continued Ordinary-Course Intercompany Transactions and Postpetition Intercompany Claims and Granting of Superpriority Status**

88.    In the ordinary course of business, the Debtors engage in various business relationships with one another and with certain Non-Debtor Affiliates under certain shared services agreements.  I believe that these intercompany relationships, as further described in the Cash Management Motion, are necessary and beneficial to the Debtors' business operations and generally provide the Debtors with material savings in respect of general administrative and corporate overhead costs (collectively, the "**Intercompany Transactions**").  As a result of the

Intercompany Transactions, cash, goods, and services flow between the Debtors and the Non-Debtor Affiliates on a regular basis.

89.     I believe the Intercompany Transactions are critical to the Debtors' operations. The Debtors rely upon the Intercompany Transactions described above for basic functions, like treasury and cash management, that are necessary to keep the Debtors' businesses operational and to ensure that the Debtors are able to pay their vendors and supply their products to their customers in a timely manner. In addition, because certain the Intercompany Transactions, including the shared services provided by the SSC and non-Debtor Imerys S.A., are provided by entities with institutional knowledge of the Debtors' operations, I believe the Debtors benefit from cost savings that they would otherwise be unable to achieve with third parties.

90.     In addition, to ensure that each individual Debtor will not fund the operations of another entity at the expense of such Debtor's creditors, in the Cash Management Motion, the Debtors request that all postpetition claims, including those arising from any transfer of cash between the Debtors, against a Debtor by another Debtor arising from transactions among them (the "**Intercompany Claims**"), be accorded superpriority administrative expense status.[22] It is my understanding that if postpetition Intercompany Claims are accorded superpriority administrative expense status, then each individual Debtor on whose behalf another Debtor has utilized funds or incurred expenses will continue to bear ultimate repayment responsibility, thereby protecting the interests of each individual Debtor's creditors.

---

[22]     For the avoidance of doubt, the Debtors reserve the right, in the Cash Management Motion, to transfer cash by and amongst themselves during the pendency of the Chapter 11 Cases.

39

###### v. Continued Use of the Debtors' Existing Cash Management System and the Debtor Bank Accounts

91.     I believe that the Cash Management System is an ordinary course, customary, and essential business practice, the continued use of which is essential to the Debtors' business operations during the Chapter 11 Cases and the Debtors' goal of maximizing value for the benefit of all parties in interest.  I believe that to require the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption.  Any disruption in the collection and disbursement of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value and repay their creditors.  Moreover, I believe that such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements and, to the best of the Debtors' knowledge, the Debtor Bank Accounts are held at financially stable institutions insured by the FDIC or, in the case of the non-U.S. bank, at a highly-rated, global financial institution that is widely recognized as well-capitalized and financially stable, and that is insured by the CDIC.  For the aforementioned reasons, I believe that maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, their estates, and their stakeholders.

92.     If the relief requested in the Cash Management Motion is granted, the Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by the Debtors prior to the Petition Date, other than those authorized by this Court. To prevent the possible inadvertent payment of prepetition claims against the Debtors, except those otherwise authorized by the Court, the Debtors will work closely with the Banks to ensure appropriate procedures are in place to prevent checks issued by the Debtors prepetition from being

honored absent this Court's approval and to ensure that no third party with automatic debit capabilities is able to debit amounts attributable to the Debtors' prepetition obligations. In light of the scope and complexity of the Cash Management System, I believe it would be onerous for the Debtors to meet the U.S. Trustee Guidelines requiring them to close all existing bank accounts and open new debtor in possession accounts. I also believe that doing so would also risk material operational problems, as the Debtors' business partners and own personnel transition to a wholly-new system

### vi. Continued Use of the Debtors' Existing Checks and Business Forms

93.     To minimize expenses to their estates, the Debtors seek authorization to continue using all checks substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors-in-possession; provided, however, that in the event the Debtors generate new checks during the pendency of the Chapter 11 Cases other than from their existing stock of checks, such checks will include a legend referring to the Debtor as "Debtor-in-Possession." I believe that changing the Debtors' existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the Debtors' estates. Further, such changes would disrupt the Debtors' business operations and would not confer any benefit upon parties that deal with the Debtors.

### vii. Waiver of Certain Requirements of the U.S. Trustee

94.     I have been generally informed of the applicable requirements of the U.S. Trustee Guidelines. As set forth above, I believe that (a) the Debtors are able to work with their current Banks to ensure that this goal of separation between the prepetition and postpetition periods is observed and (b) enforcing certain of the U.S. Trustee Guidelines would disrupt the Debtors' operations and impose a financial burden on the Debtors' estates.

41

95.     In light of the complexity of the Cash Management System, it would be onerous, unnecessarily inconvenient, and fail to produce any realizable benefits to the Debtors' estates to require the Debtors to close all of the Debtor Bank Accounts and open new debtor-in-possession accounts.

96.     Further, it would be unnecessary and inefficient to require the Debtors to abide by the UST Requirement to establish specific debtor-in-possession accounts for tax payments (including payroll taxes) and to deposit in such accounts sufficient funds to pay any tax liability (when incurred) associated with the Debtors' payroll and other tax obligations.  I believe that the Debtors can pay their tax obligations most efficiently in accordance with their existing practices, and any diversion from the Debtors' existing practices will complicate payment of the Debtors' tax obligations since certain of these fees are paid by non-Debtor Imerys USA.  Further, I believe that the U.S. Trustee will have wide latitude to monitor the flow of funds into and out of such accounts.  I also believe that the creation of new debtor-in-possession accounts designated solely for tax obligations would be unnecessarily burdensome.

### viii.     Continued Deposit Practices

97.     As part of the Cash Management System, the Debtors routinely deposit funds into the Debtor Bank Accounts (the "**Deposit Practices**").   The Debtors request (i) authorization to continue to deposit funds in accordance with existing practices under the Cash Management System, subject to any reasonable changes the Debtors may implement to the Cash Management System, and (ii) a waiver of the deposit requirements of section 345(b) of the Bankruptcy Code, on an interim basis, to the extent that such requirements are inconsistent with the Deposit Practices.  For the avoidance of doubt, to the extent the Debtor Bank Accounts may be classified as an investment account, or to the extent any of the Debtors' routine deposits into the Debtor Bank Accounts may be regarded as investment activity, the Debtors seek authorization

42

to continue to deposit funds into such Debtor Bank Accounts in accordance with existing practices, notwithstanding the requirements of section 345(b) of the Bankruptcy Code.

### B. Workforce Obligations Motion[23]

98.    By the Workforce Obligations Motion, the Debtors seek entry of interim and final orders authorizing them, in their discretion, to pay, continue, or otherwise honor various prepetition workforce-related obligations (collectively, the "**Prepetition Workforce Obligations**") to or for the benefit of their employees (the "**Employees**"), temporary workers (the "**Temporary Workers**"), and independent contractors (the "**Independent Contractors**" and, together with the Employees and Temporary Workers, the "**Workforce**") for compensation, expense reimbursements, and benefits under all plans, programs, policies, and agreements maintained by or for the benefit of, or contributed to or entered into by, the Debtors prior to the Petition Date (collectively and as further described in the Workforce Obligations Motion, the "**Workforce Programs**") in an aggregate amount not to exceed $1,914,000 on an interim basis and $2,587,000 on a final basis.  In addition, the Debtors request that the Court confirm their right to continue each of the Workforce Programs in the ordinary course of business during the pendency of the Chapter 11 Cases in the manner and to the extent that such Workforce Programs were in effect immediately prior to the filing of such cases and to make payments in connection with expenses incurred in the postpetition administration of any Workforce Program.

---

[23]    "**Workforce Obligations Motion**" means the *Debtors' Motion for Entry of Orders Under 11 U.S.C. §§ 105(a), 362(d), 363(b), 363(c), 506(a), 507(a), 541, 553, 1107(a), and 1108 and Fed. R. Bankr. 6003 (I) Authorizing the Debtors to Pay Certain Prepetition Workforce Obligations, Including Compensation, Expense Reimbursements, Benefits and Related Obligations, (II) Confirming Right to Continue Workforce Programs on Postpetition Basis, (III) Authorizing Payment of Prepetition Claims Owing to Administrators of, Third Party Providers Under, Workforce Programs, and (V) Authorizing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments.*

US-DOCS\105945964.1

99.     As described more fully in the Workforce Obligations Motion, the Prepetition Workforce Obligations arise in connection with, without limitation, plans, programs, policies, and agreements providing for: (a) wages, salaries, holiday pay, paid time off, incentive plans, and other accrued compensation; (b) reimbursement of business, travel, and other reimbursable expenses; and (c) benefits in the form of (i) medical and dental coverage, basic term life insurance, accidental death and dismemberment insurance, short-term disability coverage, long-term disability coverage, workers' compensation, and miscellaneous other benefits provided to the Workforce in the ordinary course of business, and (ii) prepetition contributions to, and benefits under 401(k) plans and pension plans.

100.     As of the Petition Date, the Debtors' Workforce consists of approximately 281 Employees, of whom 184 are employed by Debtor ITA (such Employees, the "**ITA Employees**"), 30 are employed by Debtor ITV (together with ITA, the "**US Debtors**"; and such Employees, the "**ITV Employees**" and together with the ITA Employees, the "**US Employees**"), and 67 are employed by Debtor ITC (such Employees, the "**Canadian Employees**").  The Debtors' Employees are located at the Debtors' offices in San Jose, California, and the Debtors' talc mines, plants, and distribution facilities located in: Montana (Yellowstone, Sappington, and Three Forks); Vermont (Argonaut and Ludlow); Texas (Houston); and Ontario, Canada (Timmins, Penhorwood, and Foleyet).  Approximately 97 of the Employees are salaried employees (the "**Salaried Employees**") and approximately 184 of the Employees are hourly employees (the "**Hourly Employees**").  In addition to the Employees, the Debtors' Workforce also includes approximately 23 part-time, Temporary Workers, and approximately 30 Independent Contractors.

101.     Included in the Hourly Employee headcount are approximately 108 Employees (the "**Union Employees**") who are covered by various collective bargaining agreements as further described in the Workforce Obligations Motion.  The Union Employees are all Hourly Employees, whereas the Employees not covered by collective bargaining agreements (the "**Non-Union Employees**") include both Salaried Employees and Hourly Employees.

102.     I believe that the Debtors' ability to preserve their businesses and successfully reorganize is dependent on the expertise and continued enthusiasm and service of their Workforce.  Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, I believe that the morale and, thus, the performance of the Workforce may be adversely affected.  I also believe that if the Debtors fail to pay the Prepetition Workforce Obligations in the ordinary course, their Workforce will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses.  Such a result would have a highly negative impact on Workforce morale and likely would result in unmanageable performance issues or turnover, thereby resulting in immediate and irreparable harm to the Debtors and their estates.  I believe that continuation of the Workforce Programs is vital to preserving and rebuilding Workforce morale during the pendency of the Chapter 11 Cases and to reducing the level of attrition that might otherwise occur.

**i.     Prepetition Workforce Compensation**

103.     ***Employee Payroll and Payroll Deductions***. The Debtors' Employees are typically paid bi-weekly on Thursdays or Fridays (or on the preceding business day if these dates fall on a holiday).  Employees are paid one week in arrears, so that they receive their bi-weekly earnings one week after the last day of a pay period.

104.     In the ordinary course of their businesses, the Debtors make deductions from Employees' paychecks for payments to third parties on behalf of Employees for various

45

federal, state, local, and foreign, income, FICA, employment insurance and other taxes, as well as for court ordered garnishments, union dues, savings programs, repayments for loans taken against the savings programs, benefit plans, insurance and other similar programs (collectively, the "**Deductions**").   The Debtors' average bi-weekly Deductions for Employees aggregate approximately $286,000.

105.   The Debtors estimate that, as of the Petition Date, accrued but unpaid wages and Deductions total approximately $714,000 (comprised of $522,000 owed to the Employees on account of unpaid wages and $192,000 attributable to the Deductions).

106.   *Temporary Workers*.  In addition to the Employees, the Debtors currently retain approximately 23 Temporary Workers to perform a variety of tasks related to the Debtors' mining operations in the ordinary course of business.  The Temporary Workers generally earn hourly rates and the employment agencies provide the Debtors with invoices for the Temporary Workers' services (and generally are paid) on a bi-weekly basis.  As of the Petition Date, the Debtors have approximately $135,000 of accrued but unpaid liability with respect to the Temporary Workers.

107.   *Independent Contractors*.  In addition to the Employees and Temporary Workers, the Debtors currently retain approximately 30 Independent Contractors to perform a variety of tasks related to the Debtors' mining operations in the ordinary course of business.  The Independent Contractors generally earn hourly rates and the Independent Contractors or their contracting agency, if applicable, provide the Debtors with invoices for the Independent Contractors' services (and generally are paid) on either a monthly or bi-weekly basis.  As of the Petition Date, the Debtors have approximately $62,000 of accrued but unpaid liability with respect to the Independent Contractors.

used

108.   ***PTO, vacation days, and sick leave***.  The Debtors offer their Employees paid time off ("**PTO**"), for among other things vacation, holidays and sick leave. The specifics of the Debtors' PTO policies vary based upon whether the Employee is a Salaried Employee, Non-Union Hourly Employee, or a Union Employee.  I believe these programs are typical and customary, and continuing to offer them is necessary for the Debtors to retain Employees during the reorganization process.

109.   ***Employee Incentive Programs***.  In the ordinary course of business, in order to encourage and reward outstanding performance, the Debtors offer eligible Employees the opportunity to earn bonuses under various bonus and incentive programs (collectively, the "**Employee Incentive Programs**"), under which the Employees are eligible to earn awards based on individual and business targets.  The Debtors paid approximately $4,757,000 on account of the Employee Incentive Programs during the twelve month period prior to the Petition Date, of which approximately $3,200,000 was earned during the 2017 calendar year and approximately $1,557,000 was earned during the 2018 calendar year.  As of the Petition Date, the Debtors estimate that accrued and unpaid amounts under the Employee Incentive Programs total approximately $94,000.  Given the large percentage of the Employees covered by the Employee Incentive Programs, I believe that any interruption in payments pursuant to the Employee Incentive Programs could upset Employee morale or cause attrition, which could lead to severe disruptions to the Debtors' operations.

**ii.     Prepetition Employee Reimbursements**

110.   ***Business Expenses***.  The Debtors, in the ordinary course of their business, reimburse Employees for a variety of ordinary, necessary, and reasonable business-related expenses that Employees incur within the scope of their job duties.   In certain instances, Employees may be issued corporate credit cards through American Express to pay for

47

reimbursable expenses.  The average monthly amount of business expenses reimbursed, directly or indirectly, by the Debtors is approximately $242,000, inclusive of amounts that are owed on the Credit Cards.  The Debtors estimate that there are accrued but unpaid amounts owing on account of Employees' business expenses totaling approximately $438,000 as of the Petition Date.

111.    ***Vehicle Programs***.    The Debtors also maintain Vehicle Programs (as defined in the Workforce Obligations Motion) through which eligible Employees who use vehicles in the ordinary course of their work, and maintain a vehicle meeting certain standards and conditions, are provided a monthly vehicle allowance.  As of the Petition Date, approximately 39 Employees participate in the Vehicle Programs.  The Debtors estimate that there are accrued but unpaid amounts under the Vehicle Programs of approximately $4,000 as of the Petition Date.

112.    ***Relocation Expenses***.  In the ordinary course of business, the Debtors cover relocation expenses if an Employee relocates at the request of the Debtors (the "**Relocation Expenses**").  As of the Petition Date, the Debtors have no accrued but unpaid liability with respect to Relocation Expenses, but the Debtors seek to continue to pay Relocation Expenses as they arise in the ordinary course of business.

113.    ***Miscellaneous Expenses***.  The Debtors also reimburse their Employees for certain other miscellaneous programs and benefits (the "**Miscellaneous Reimbursement Programs**").  For example, the Debtors, at the discretion of an Employee's applicable business unit, may reimburse (or pay directly for) certain professional expenses, such as required continuing education expenses, professional license fees or dues, and subscriptions.  The total amount of reimbursements paid by the Debtors under these Miscellaneous Reimbursement Programs average approximately $6,000 per month.  As of the Petition Date, the Debtors estimate

48

that accrued and unpaid amounts under the Miscellaneous Reimbursement Programs total approximately $9,000.

### iii.    Employee Benefits

114.    Prior to the Petition Date, the Debtors offered Employees and their eligible spouses and dependents various standard employee benefits, including, without limitation, (a) medical insurance (b) dental insurance, (c) basic term life and accidental death and dismemberment insurance, (d) long-term and short-term disability insurance, (e) savings and related types of benefits, (f) workers' compensation, (g) severance benefits, and (h) miscellaneous other benefits provided to the Employees in the ordinary course of business (collectively, the "**Employee Benefits**").

115.    As further provided in the Workforce Obligations Motion, certain of the Employee Benefits remained unpaid or unprovided as of the Petition Date because certain obligations of the Debtors under the applicable plan, program, or policy accrued either in whole or in part prior to the commencement of the Chapter 11 Cases, but will not be required to be paid or provided in the ordinary course of the Debtors' business until a later date.  The Debtors request authority to pay or provide as they become due all prepetition Employee Benefits that have already accrued.  The Debtors estimate that the aggregate accrued amount of such prepetition Employee Benefits described in the Workforce Obligations Motion is approximately $1,064,000.

### iv.    Payments to Independent Directors

116.    Each of the Debtors' board of directors includes a non-Employee independent director, Kevin Collins (the "**Independent Director**").  The Independent Director is paid quarterly fees within thirty (30) days after the end of each fiscal quarter, in the amount of $16,666.67 from ITV, $16,666.67 from ITA, and $16,666.67 from ITC.  Beginning with the quarter starting on April 2, 2019, the Independent Director will receive quarterly fees of $6,666.67

49

from ITV, $6,666.67 from ITA, and $6,666.67 from ITC. I believe that the Independent Director's service is necessary for the continued management of the Debtors and, accordingly, it is essential that the Debtors be authorized to pay all prepetition amounts accrued as of the Petition Date to the Independent Director. As of the Petition Date, there are no accrued but unpaid monthly fees owed to the Independent Director, but the Debtors seek the authority to reimburse any unpaid expenses incurred by the Independent Director prior to the Petition Date not to exceed $5,000 without further order of the Court.

### v.    Payments to Administrators

117.    With respect to the Employee compensation and benefits described in the Workforce Obligations Motion, the Debtors, directly or indirectly, contract with several vendors to administer and deliver payments or other benefits to their Employees (the "**Administrators**"). For example, the Debtors, in the ordinary course of business, pay average monthly fees of approximately $9,000 in arrears directly to ADP (as defined in the Workforce Obligations Motion) in connection with payroll administration. As of the Petition Date, the Debtors estimate that they owe approximately $13,000 to ADP. The Debtors pay additional Administrators' fees and expenses indirectly through non-debtor affiliates or their employee benefits consultants.

118.    I believe that the Administrators may fail to adequately and timely perform or may terminate their services to the Debtors unless the Debtors pay the Administrators' prepetition claims for administrative services rendered and expenses incurred. If the Debtors were required to replace the Administrators postpetition, it likely would cause significant disruption to the payment of benefits and other obligations to the Workforce. Accordingly, I believe that the payment of claims owed to the Administrators is in the best interest of the Debtors' estates.

US-DOCS\105945964.1

### vi.    Payments to Employee Benefits Consultants

119.    With respect to the Employee Benefits described in the Workforce Obligations Motion, the Debtors contract with several consultants (the "**Employee Benefits Consultants**") to provide strategic advice and to act as liaisons and administrative agents between the Debtors and the third party insurers, administrators and providers of the Employee Benefits. The Debtors estimate that the aggregate accrued amount of such prepetition payments owed in connection with the Employee Benefits Consultants is approximately $49,000.   Unless the prepetition claims owed to the Employee Benefits Consultants are paid, I believe that the Employee Benefits Consultants may fail to perform adequately and timely or may terminate their services to the Debtors, which would likely cause significant disruption to the payment of benefits and other obligations to or for the benefit of the Workforce.

### C.  Tax Motion[24]

120.    By the Tax Motion, the Debtors seek entry of interim and final orders authorizing the Debtors, in their sole discretion, to pay and set off any prepetition tax and fee obligations including, without limitation, international taxes, state and federal income taxes, franchise taxes, property taxes, sales and use taxes, licenses and fees, and any other types of taxes, fees, assessments or similar charges and any penalty, interest or similar charges in respect of such taxes (collectively, the "**Taxes and Fees**") owing to (i) certain international, federal, state and local governmental and quasi-governmental entities (the "**Taxing Authorities**"),[25] (ii) Imerys USA, as reimbursement for amounts paid by Imerys USA on behalf of the Debtors on account of

---

[24]      "**Tax Motion**" means the *Debtors' Motion for Orders Under 11 U.S.C. §§ 105(a), 363(b), 506(a), 507(a)(8), and 541 and Fed. R. Bankr. P. 6003 Authoring Payment of Prepetition Taxes and Fees.*

[25]      A list of all international, federal, state, and local governmental and quasi-governmental entities to which the Debtors or the Debtors' officers and directors may be liable is attached as Exhibit C to the Tax Motion.

US-DOCS\105945964.1

the Taxes and Fees, and (iii) as between Debtors ITA and ITV for amounts reimbursed to Imerys

USA by ITA on behalf of ITV on account of the Taxes and Fees.  The Debtors propose to limit

the aggregate amount of payments to be made on account of prepetition Taxes and Fees under the

Tax Motion to (i) $715,000 on interim basis and (ii) $1,505,000 on final basis.

121.   The manner in which the Debtors pay the Taxes and Fees varies.  With

respect to certain of the Taxes and Fees, the Debtors pay the applicable Taxing Authority directly.

With respect to other Taxes and Fees, Imerys USA makes payments to the applicable Taxing

Authority on account of the collective Taxes and Fees of Debtors ITA and ITV and certain of

their non-debtor affiliates.  ITA historically reimbursed Imerys USA for payments made on

account of ITA and ITV by setting off these amounts against intercompany loan amounts owed

by Imerys USA to ITA pursuant to an intercompany loan agreement.  Following the Petition Date,

I understand that ITA intends to pay amounts owed to Imerys USA on account of Taxes and Fees

directly via check rather than by setting off such amounts against intercompany loans.[26]

122.   Although, as of the Petition Date, the Debtors were substantially current in

the payment of assessed and undisputed Taxes and Fees, certain Taxes and Fees attributable to

the prepetition period may not yet have become due.  Certain prepetition Taxes and Fees will not

be due until the applicable monthly, quarterly, or annual payment dates – in some cases

immediately and in others not until next year.  I have been informed that, as of the Petition Date,

the Debtors estimate that they have accrued liabilities, which are not yet due, in the approximate

amount of $1,505,000 on account of Taxes and Fees.

---

[26]    Additional information regarding the Debtors' prepetition system of intercompany loan set offs and
postpetition payment procedures with respect to the Taxes and Fees is included in the Cash Management
Motion and the Tax Motion.

123.   If the Taxes and Fees are not timely paid, I believe that the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws.  Moreover, I understand that nonpayment or delayed payment of the Taxes and Fees may also subject the Debtors to efforts by certain governmental entities, whether or not permissible under the Bankruptcy Code, to revoke the Debtors' licenses and other privileges either on a postpetition or post-confirmation basis.  I also understand that certain of the Taxes and Fees may be considered to be obligations as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment.  In such events, I believe that collection efforts by the Taxing Authorities would create obvious distractions for the Debtors and their officers and directors in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.  Accordingly, I believe that the continued payment of the Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful chapter 11 process.

### D.   Insurance and Bonding Motion[27]

124.   By the Insurance and Bonding Motion, the Debtors request entry of of interim and final orders authorizing them to pay and set off prepetition amounts owed under their ordinary course insurance policies and bonding program, and to maintain their insurance policies and bonding program in the ordinary course postpetition.  The Debtors propose to limit the aggregate amount of prepetition payments on account of their Insurance Policies (as defined

---

[27]      "**Insurance and Bonding Motion**" means *Debtors' Motion for Orders Under 11 U.S.C. §§105(a), 362(d), 363(b), and 503(b) Authorizing Debtors' to (I) Pay Their Prepetition Insurance Obligations, (II) Pay Their Prepetition Bonding Obligations, (III) Maintain Their Postpetition Insurance Coverage, and (IV) Maintain Their Bonding Program.*

US-DOCS\105945964.1

below) to $600,000. The Debtors propose to limit the aggregate amount of prepetition payments on account of their Bonding Obligations (as defined below) to $100,000.

### i.    The Debtors' Insurance Obligations

125.    In the ordinary course of business, the Debtors maintain certain insurance policies that are administered by multiple third-party insurance carriers (the "**Insurance Carriers**"), including commercial and general liability, umbrella liability, automobile, ERISA bond, fiduciary liability, property, employment practices liability, crime, directors' and officers' liability, and cargo (collectively, the "**Insurance Policies**").[28] I believe that the Insurance Policies are essential to the preservation of the Debtors' businesses, property, and assets, and, in some cases, I understand that such coverage is required by various federal and state laws and regulations, as well as the terms of the Debtors' various commercial contracts. It is also my understanding that the Insurance Policies provide coverage that is typical in scope and amount for businesses within the Debtors' industry.

126.    The manner in which the Debtors pay premiums, Brokers' Fees (as defined in the Insurance and Bonding Motion), and other costs associated with the Insurance Policies (such amounts, the "**Insurance Obligations**") depends on the Insurance Policy. With respect to some Insurance Policies, the Debtors pay the applicable Insurance Carrier or Broker (as defined in the Insurance and Bonding Motion), who in turn pays the applicable Insurance Carrier, on account of the Debtors' Insurance Obligations. With respect to other Insurance Policies, ITA pays the applicable Insurance Carrier or Broker, who in turn pays the applicable Insurance Carrier, on account of the collective Insurance Obligations of itself, ITV, and, with respect to certain

---

[28]    A detailed list of the Debtors' Insurance Policies is attached to the Insurance and Bonding Motion as Exhibit C.

54

Insurance Policies, ITC.  With respect to yet other Insurance Policies, Imerys USA pays the applicable Insurance Carrier or Broker, who in turn pays the applicable Insurance Carrier, on account of the collective Insurance Obligations of Debtors ITA and ITV and certain of their non-debtor affiliates.  ITA historically reimbursed Imerys USA (either directly or indirectly through an affiliate intermediary, as described in the Insurance and Bonding Motion) for payments made on account of ITA and ITV by setting off those amounts against intercompany loan amounts owed by Imerys USA to ITA.  Following the Petition Date, I understand that ITA intends to pay amounts owed to Imerys USA on account of Insurance Obligations directly via check rather than by setting off such amounts against intercompany loans. [29]

127.    In addition to the Insurance Policies listed in the Insurance and Bonding Motion, and as further described herein, the Debtors have access to, and rights under, various historical liability policies and indemnification agreements (collectively, the "**Historical Policies**") with insurers, indemnitors, and other third parties (collectively, the "**Historical Policy Counterparties**") that cover, among other things, certain talc-related personal injury liabilities and related litigation costs (including defense costs).  I understand that the payment of defense costs by certain of the Historical Policy Counterparties (specifically, The American Insurance Company, Truck Insurance Exchange, National Union Fire Insurance Company of Pittsburgh, PA, Zurich American Insurance Company, Zurich Insurance Company, and XL Insurance America, Inc.) does not erode the underlying coverage available to the Debtors under the Historical Policies.  I do not believe Court approval is required to maintain such Historical Policies, as no current or future payments are expected to be made by the Debtors with respect

---

[29]    Additional information regarding the Debtors' prepetition system of intercompany loan set offs and postpetition payment procedures with respect to the Insurance Obligations is included in the Cash Management Motion and the Insurance and Bonding Motion.

US-DOCS\105945964.1

thereto.  Nevertheless, out of an abundance of caution and in the interest of disclosure, in the Insurance and Bonding Motion the Debtors submit that they will continue to maintain such Historical Policies and exercise their rights thereunder in the ordinary course of business.[30]

128.  The Debtors' Insurance Policies renew at various times throughout each year.  The Debtors pay all of the annual premiums due for each of the policies at the beginning of each particular policy period.  The total amount paid in annual premiums and payments associated with all of the Insurance Policies is approximately $515,000, approximately $320,000 of which is paid by the Debtors directly to the Insurance Carriers or Brokers and approximately $195,000 of which is paid by Imerys USA to the Insurance Carriers or Brokers on behalf of the Debtors.  I understand that as of the Petition Date, approximately $600,000 may be currently due on account of Prepetition Insurance Obligations, of which approximately $25,000 may be due in connection with Broker's Fees.

129.  I believe that maintenance of insurance coverage under the various Insurance Policies is essential to the continued operation and preservation of value of the Debtors' assets and, indeed, it is my understanding that it is required under the U.S. Trustee Guidelines, the federal laws and regulations applicable to the Debtors' business, the laws of the various states in which the Debtors operate and the Debtors' various contractual commitments. Moreover, I believe the Debtors' maintenance of their relationships with the Insurance Carriers is critical to ensuring the continued availability of insurance coverage and reasonable pricing of such coverage for future policy periods.  Thus, I believe the Debtors should be authorized, but not directed, to continue to pay and set off premiums, taxes, claims, deductibles, charges, fees, indemnity

---

[30]    In the Insurance and Bonding Motion, the Debtors reserve the right to seek additional relief from the Court with respect to these historical policies and any rights or obligations thereunder.

US-DOCS\105945964.1

obligations and other obligations, including Broker's fees, owed under or with respect to the Insurance Policies as such obligations come due in the ordinary course of the Debtors' business.

### ii.    The Debtors' Bonding Program

130.    In the ordinary course of business, the Debtors are required by certain applicable statutes, rules, and regulations to purchase new, supplemental, or replacement surety bonds (such bonds, together with the surety bonds outstanding as of the Petition Date, the "**Bonding Program**").  Under the Bonding Program, Imerys USA issues surety bonds to certain Sureties (as defined in the Insurance and Bonding Motion) to secure the Debtors' payment or performance of certain obligations, often to governmental units or other public agencies.  The Bonding Program generally covers reclamation, performance, license/permit, customs and border protection and appeal obligations (collectively, the "**Covered Obligations**").[31]  I believe that the Bonding Program provides coverage that is typical in scope and amount for businesses within the Debtors' industry.

131.    The manner in which the Debtors pay amounts owed to the Sureties (such amounts the "**Bonding Obligations**") varies.  ITC pays the applicable Surety directly on account of all of its Bonding Obligations.  ITA pays the applicable Surety directly on account of the appeal bond.  With respect to the other bonds, Imerys USA pays the Bonding Obligations on behalf of Debtors ITA and ITV and certain of their non-debtor affiliates.  ITA historically reimbursed Imerys USA (either directly or indirectly through an affiliate intermediary entity, as described in the Insurance and Bonding Motion) for payments made on account of ITA and ITV by setting off those amounts against intercompany loan amounts owed by Imerys USA to ITA.  Following the

---

[31]    A detailed list of the surety bonds that are currently maintained for the benefit of the Debtors is attached to the Insurance and Bonding Motion as <u>Exhibit D</u>.

US-DOCS\105945964.1

Petition Date, I understand that ITA intends to pay amounts owed to Imerys USA on account of Bonding Obligations directly via check rather than by setting off such amounts against intercompany loans.[32]

132. The premiums for the surety bonds are generally determined on an annual basis and are paid when the bonds are issued and annually upon renewal. The total amount paid in annual premiums and payments associated with all of the surety bonds is approximately $500,000. I understand that as of the Petition Date, the Debtors estimate that all premium payments due and owing under the Bonding Program have been paid in full and the Debtors are not aware of any pending requests for payment by the Sureties.

133. I believe that the success of the Debtors' efforts to operate effectively and efficiently will depend on the maintenance of the Bonding Program on an uninterrupted basis. To continue their business operations, the Debtors must be able to provide financial assurances to federal and state governments, regulatory agencies, and other third parties. This, in turn, requires the Debtors to maintain access to the existing Bonding Program maintained by Imerys USA, including by paying the Bonding Obligations as they come due, as well as renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of their businesses, requesting releases from obsolete bonding obligations, and executing other agreements in connection with the Bonding Program. Accordingly, I believe it is important that the Debtors be authorized to participate in the Bonding Program in the same manner as they did prepetition and to pay or set off any prepetition or postpetition Bonding Obligations, and revise, extend,

---

[32]     Additional information regarding the Debtors' prepetition system of intercompany loan set offs and postpetition payment procedures with respect to the Bonding Obligations is included in the Cash Management Motion and the Insurance and Bonding Motion.

supplement, or change the Bonding Program as needed, including through the issuance of new surety bonds.

### E.  Utilities Motion[33]

134.   In the Utilities Motion, the Debtors request entry of interim and final orders, approving procedures that would provide adequate assurance of payment to their utility service providers (the "**Utility Companies**") under section 366 of the Bankruptcy Code, while allowing the Debtors to avoid the threat of imminent termination of electricity, water, natural gas, diesel and gasoline, compressed natural gas, waste management, propane, telecommunications, and similar utility products and services (collectively, the "**Utility Services**") from the Utility Companies.

135.   As of the Petition Date, approximately thirty-five Utility Companies provide Utility Services to the Debtors at various locations.[34]  The Utility Companies service the Debtors' operations and facilities related to the Debtors' mining, processing, and global distribution of talc.  The success and smooth operation of the Debtors' businesses depend on the reliable delivery of electricity, fuel, and the other Utility Services.  The Debtors require the Utility Services to operate their businesses, manage their mines and plants, and maintain and service the equipment the Debtors use to service their customers.  I am not currently aware of any past due amounts owed to any of the Utility Companies.  Based on the timing of the filings in relation to the Utility Companies' billing cycles, however, there may be utility costs that have been invoiced

---

[33]      "**Utilities Motion**" Means the *Debtors' Motion for Orders Under 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit as Adequate Assurance of Payments, and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment.*

[34]      A non-exclusive list of the Utility Companies and the Utility Services they provide is attached to the Utilities Motion as Exhibit A.

US-DOCS\105945964.1

to the Debtors for which payment is not yet due and utility costs for services provided since the end of the last billing cycle that have not yet been invoiced to the Debtors.

136.   I understand that the Debtors intend to pay all postpetition obligations owed to the Utility Companies in a timely manner.  Nevertheless, to provide additional assurance of payment for future services to the Utility Companies, the Debtors will deposit $500,000, which is an amount equal to approximately fifty percent of the estimated monthly cost of the Utility Services, into a newly created, segregated, interest-bearing account, within twenty days of the Petition Date (the "**Adequate Assurance Deposit**").  The Adequate Assurance Deposit will be maintained during the Chapter 11 Cases, subject to adjustment by the Debtors to account for the termination or beginning of new Utility Services by the Debtors or entry into other arrangements with respect to adequate assurance of payment reached with individual Utility Companies.

### F.  Customer Programs Motion[35]

137.   By the Customer Programs Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to satisfy, in their discretion, various obligations owed to customers and distributors, including Rebates, Commissions, and Warranties (each as defined below, and together the "**Customer Obligations**") that the Debtors deem beneficial and cost-effective to their businesses, and to otherwise continue their customer practices.  The Debtors propose to limit the aggregate amount of payments to be made on account of prepetition Customer Obligations under the Customer Programs Motion to (i) $600,000 on interim basis and (ii) $1,900,000 on final basis.

---

[35]    "**Customer Programs Motion**" means *Debtors' Motion for Orders Under 11 U.S.C.  §§ 105(a), 363(b), 363(c), 506(a) and 533 and Fed. R. Bankr. P. 6003 and 6004 Authorizing (I) the Debtors to Honor Prepetition Obligations to Customers and to Otherwise Continue Customer Programs and (II) Financial Institutions to Honor and Process Related Checks and Transfers.*

138.    As discussed herein, the Debtors mine, process, and distribute talc for use in personal care, industrial, and other specialty products.  In some instances, the Debtors supply talc directly to their customers, which include third-party manufacturers of such products.  In other instances, the Debtors supply talc to third-party distributors, who serve as a conduit between the Debtors and the product manufacturers.  I believe that the Debtors' goodwill and ongoing business relationships may erode if their customers or distributors perceive that the Debtors are unable or unwilling to fulfill the prepetition commitments they have made through the Customer Obligations.  I also believe that if the Debtors are unable to preserve the loyalty of their customers and distributors, the Debtors' businesses would likely suffer material harm.  Accordingly, I believe that granting the relief requested in the Customer Programs Motion is in the best interests of the Debtors, their estates, and their creditors.

139.    The following are general descriptions and examples of the programs through which the Debtors incur the Customer Obligations.

i.    **Rebates**

140.    Under the Debtors' rebate program, if a customer purchases a certain amount of talc within a designated one-year period, the Debtors issue a credit (a "**Rebate**") to such customer.  The value of the Rebate increases as the total volume of talc purchased increases.[36]  Thus, both the rate at which the Rebate is earned and the Rebate's aggregate value increase as the volume of talc purchased increases.  The Debtors settle their two largest customer

---

[36]    As an example, the first 1-100 pounds of talc a customer purchases from the Debtors may result in a Rebate amounting to $0.01 per pound, while the next 101-200 pounds of talc a customer purchases from the Debtors may result in a Rebate amounting to $0.02 per pound.  These numbers are hypothetical and do not reflect actual Rebate amounts.

61

Rebates via check on an annual basis.  The Debtors settle their other customer Rebates via check on a periodic basis.

141.   The manner in which the Debtors pay the Rebates varies.  For Rebates owed by ITC, Rebate checks are issued directly by ITC to the customer.  Historically, for Rebates owed by ITA or ITV, the Rebate check was issued to the customer by Imerys USA.  ITA then reimbursed Imerys USA for Rebate payments made on account of ITA and ITV by setting off such amounts against intercompany loan amounts owed by Imerys USA to ITA.  Following the Petition Date, I understand that ITA intends to issue checks on account of Rebates owed by ITA and ITV directly to the customer.[37]

142.   Given that the Rebates are based on ongoing sales volumes, I understand that it is difficult to calculate the exact amount of Rebates accrued prior to the Petition Date.  I understand that the Debtors estimate that the value of the Rebates accrued prior to the Petition Date is approximately $1,000,000.

### ii.    Commissions

143.   The Debtors issue commissions to (i) certain third party distributors (the "**Third Party Distributors**") who supply the Debtors' talc to customers that are located in geographic areas not easily accessible by the Debtors (the "**Third Party Distributor Commissions**") and (ii) certain of their non-debtor affiliates (the "**Affiliate Distributors**"),[38] who sell talc produced by the Debtors to third parties (the "**Affiliate Distributor Commissions**" and, together with the Third Party Distributor Commissions, the "**Commissions**").

---

[37]    Additional information regarding the Debtors' prepetition system of intercompany loan set offs and postpetition payment procedures with respect to the Rebates is included in the Cash Management Motion and the Customer Programs Motion.

[38]    Such non-debtor affiliate distributors include Kentucky-Tennessee Co. and Celite Korea Ltd., among others.

62

144.    The amount of the Third Party Distributor Commissions earned by Third Party Distributors is either based on the volume of the talc distributed or a pre-negotiated flat fee amount.  Once earned, a Third Party Distributor Commission is paid either through a credit issued by the applicable Debtor against the Third Party Distributor's outstanding accounts receivable, or through a check or ACH issued to the Third Party Distributor.  The Debtors generally pay the Third Party Distributor Commissions on a quarterly or monthly basis depending on the terms.

145.    The manner in which the Debtors pay the Commissions varies.  With respect to Commissions owed by ITC, where a Third Party Distributor is paid via check or ACH, ITC issues such check or ACH directly to the Third Party Distributor.  With respect to Commissions owed by ITA or ITV, historically, where the Third Party Distributor was paid via check or ACH, such checks or ACHs were issued by Imerys USA and then ITA reimbursed Imerys USA in the manner described above.  Following the Petition Date, I understand that ITA intends to issue checks on account of Third Party Distributor Commissions owed by ITA and ITV directly to the Third Party Distributor.[39]

146.    I understand that the Debtors estimate that approximately $200,000 is owed to Third Party Distributors and Imerys USA as of the Petition Date on account of prepetition Third Party Distributor Commissions.

147.    As with the Third Party Distributor Commissions, the amount of Affiliate Distributor Commissions earned by Affiliate Distributors is either based on the volume of the talc distributed or a pre-negotiated flat fee amount.  Once earned, the Debtors have historically settled Affiliate Distributor Commissions by setting off those amounts against intercompany loan

---

[39]    Additional information regarding the Debtors' prepetition system of intercompany loan set offs and postpetition payment procedures with respect to the Commissions is included in the Cash Management Motion and the Customer Programs Motion.

amounts owed by the Affiliate Distributor to the applicable Debtor.  Such intercompany transactions were then recorded in such Debtor's and the Affiliate Distributor's books and records.  Following the Petition Date, I understand that, the Debtors intend to settle Affiliate Distributor Commissions by issuing checks directly to the Affiliate Distributor rather than by setting off such amounts against intercompany loans.[40]

148.   I understand that the Debtors estimate that approximately $200,000 is owed to Affiliate Distributors as of the Petition Date on account of prepetition Affiliate Distributor Commissions.

### iii.    Warranties

149.   Under certain customer contracts, the Debtors guarantee that the talc products they supply will comply with certain customer specifications (such arrangement, the "**Spec Warranty**").  Pursuant to the Spec Warranty, if the Debtors fail to comply with such specifications, customers must file a complaint with the Debtors, and, upon satisfactory review of the complaint, the Debtors will generally reimburse the customer the amount paid for the non-conforming product.  The Spec Warranty is paid either through a credit issued by the applicable Debtor against the customer's outstanding accounts receivable, or through a check issued to the customer.

150.   The manner in which the Debtors pay Spec Warranty amounts varies.  With respect to amounts owed by ITC on account of Spec Warranties, where a customer is paid via check, ITC issues such check directly to the customer.  With respect to amounts owed by ITA or ITV on account of Spec Warranties, historically, where the customer was paid via check, such

---

[40]    Additional information regarding the Debtors' prepetition system of intercompany loan set offs and postpetition payment procedures with respect to the Warranties is included in the Cash Management Motion and the Customer Programs Motion.

US-DOCS\105945964.1

check was issued by Imerys USA and then ITA reimbursed Imerys USA in the manner described above. Following the Petition Date, I understand that ITA intends to issue checks for Spec Warranty amounts owed by ITA and ITV directly to the customer. [41]

151. Additionally, the Debtors guarantee their supply of certain talc products (such arrangement the "**Supply Warranty**" and together with the Spec Warranty, the "**Warranties**"). Pursuant to the Supply Warranty, in the event that one of the Debtors' plants does not have a customer's specified product, one of the other Debtors will provide such customer with the specified product from its own inventory. The customer is not charged any additional cost for this substitution.

### III.    CONTINUING VENDOR MOTIONS

#### A.    Critical Vendor Motion[42]

152. By the Critical Vendor Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to pay the prepetition fixed, liquidated, and undisputed claims (the "**Critical Vendor Claims**") owing to certain suppliers of goods and services, with whom the Debtors continue to do business and whose goods and services are critical and essential to the Debtors' operations (the "**Critical Vendors**") in an amount not to exceed $700,000 on an interim basis and $1,100,000 on a final basis.

153. As described herein, the Debtors operate global businesses that are primarily engaged in the mining and processing of talc in North America, and the distribution of

---

[41]    Additional information regarding the Debtors' prepetition system of intercompany loan set offs and postpetition payment procedures with respect to the Customer Programs is included in the Cash Management Motion and the Customer Programs Motion.

[42]    "**Critical Vendor Motion**" means the *Debtors' Motion for Orders Under 11 U.S.C. §§ 105(a), 363(b), 503(b)(9), 1107(a), and 1108 and Fed. R. Bankr. P. 6003 (I) Authorizing Payment of Prepetition Claims of Critical Vendors; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief.*

US-DOCS\105945964.1

their talc products to countries in North America, South America, Europe, and Asia. The Debtors'
ordinary course operations generally involve the extraction of talc from their mines in North
America, the processing and treatment of talc at their plants, and the packaging and distribution
of finished talc products to customers around the world. In order to ensure the success of the
Debtors' businesses, the Debtors necessarily rely on certain Critical Vendors that provide the
Debtors with the materials, supplies, and/or services necessary to conduct their operations. I
believe that without the goods and services provided by the Critical Vendors, the Debtors would
be unable to efficiently mine and process their talc or supply talc products to their customers.

154. I believe payment of the Critical Vendor Claims is necessary due to the
critical nature of the goods and services provided by the Critical Vendors. These goods and
services are critical for several reasons. First, certain of the Debtors' mines and other operations
are in remote locations, and therefore there are often a limited number of vendors and suppliers
in close proximity to the Debtors. Accordingly, certain Critical Vendors represent one of a few
vendors or the only vendor within a particular area that can provide the goods and services that
the Debtors require to operate their businesses. In addition, the Debtors require certain specialized
supplies, materials, and equipment that only a handful of vendors have the means or skillset to
provide. Therefore, if these existing Critical Vendors were to stop doing business with the
Debtors, I believe it would be difficult (if not impossible) and cost-prohibitive for the Debtors to
locate alternative vendors and suppliers. The Debtors further rely on certain vendors, like
transportation providers and administrative service providers, that are necessary to maintain the
Debtors' supply chain, and any inability to continue receiving services from these specific
vendors would greatly disrupt the Debtors' businesses. Accordingly, I believe it is essential that
the Debtors receive authorization to pay the Critical Vendor Claims of such vendors and service

US-DOCS\105945964.1

providers, subject to the criteria specified in the Critical Vendors Motion, because payment of such claims is necessary to achieve their chapter 11 objectives, provide initial supply chain stability, and to preserve the value of their businesses for the benefit of their constituents.

155.   I have been informed that to ensure that the Debtors correctly identify their Critical Vendors, certain of the Debtors' employees and professionals who are responsible for maintaining, and have intimate knowledge of, the Debtors' vendor and service provider relationships, have conducted, and will continue to conduct, an extensive analysis and review of the Debtors' immediate needs for goods and services.

156.   I understand that as part of such analysis and review, the Debtors have used, and will continue to use, the following criteria to determine which of the Debtors' vendors and service providers should be designated as Critical Vendors: (a) whether the vendor or service provider is a sole-source or limited source provider; (b) whether the Debtors receive advantageous pricing or other terms from a vendor or service provider such that a postpetition replacement would result in significantly higher costs; (c) whether quality requirements, geographic constraints, customizations, or other specifications prevent the Debtors from obtaining the necessary goods or services from alternative sources within a reasonable timeframe; (d) whether, if the vendor is not a sole source provider, the Debtors have insufficient inventory of goods or in-house capabilities to continue operations while a replacement is found and put into place; (e) whether a vendor or service provider is contractually obligated to continue to provide goods and services but the Debtors cannot afford the time and expense of an enforcement action if the vendor or service provider wrongfully refuses to perform; (f) whether a vendors' prepetition claim is entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code; and (g) whether a vendor or service provider meeting any of the aforementioned standards in

US-DOCS\105945964.1

(a) through (f) refuses to, demands pricing or trade terms that constitute an effective refusal to, or is likely financially unable to, provide goods or services to the Debtors on a postpetition basis if the prepetition balances are not paid.  I am confident that this process will result in designating only those vendors and service providers that are truly critical to the Debtors' estates as Critical Vendors.

157.    Among the Critical Vendors identified by the Debtors are certain providers of essential goods and services that the Debtors rely upon in the operation of their businesses and include (i) specialty packaging suppliers, (ii) mine and plant related equipment suppliers and service providers, (iii) administrative and logistic service providers, and (iv) chemical suppliers and manufacturers.  I believe that many of these vendors are critical to the Debtors' businesses because they possess unique technical knowledge regarding, and have familiarity with, the Debtors' talc operations and/or are located near the Debtors' operations.  I believe that even in those instances where the Debtors could potentially locate a suitable replacement vendor, the Debtors have determined that replacing any of the Critical Vendors would be cost-prohibitive and disruptive to the Debtors' operations.  Furthermore, I believe that the requisite time to qualify and replace incumbent Critical Vendors could impair scheduling and delivery commitments.  Therefore, I believe that any such disruptions could result in delays in the mining, processing, or delivery of the Debtors' talc products, which could, in turn, cause irreparable harm to the Debtors' businesses.

158.    Vendors and service providers of the nature described above, and others that satisfy the criteria described above, fall under the rubric of Critical Vendors. I believe that there is a high likelihood that such Critical Vendors would no longer do business with the Debtors if they are not paid on account of any outstanding prepetition claims.  Any refusal by the Critical

68

Vendors to provide essential goods or perform key services would have immediate and severe adverse repercussions, including jeopardizing or impairing the value of the Debtors' businesses. Under these circumstances, I believe that paying the Critical Vendor Claims is both necessary and essential to the Debtors' ability to achieve their chapter 11 objectives and preserve value for their various constituencies.

159.   I understand that the Debtors will attempt to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to continue supplying goods or services to the Debtors on trade terms that are the same or better than the trade terms that existed immediately prior to the Petition Date or, if more favorable, within the sixty day period prior to the Petition Date (the "**Customary Trade Terms**").  The Debtors reserve the right to negotiate new trade terms (the "**Minimum Credit Terms**") with any Critical Vendor as a condition to payment of any Critical Vendor Claim, in the Debtors' sole discretion.

160.   I understand that to ensure that the Critical Vendors deal with the Debtors on either Customary Trade Terms or Minimum Credit Terms, the Debtors propose that a letter agreement (a "**Trade Agreement**") be sent to the Critical Vendors for execution, together with a copy of the Order granting the Critical Vendors Motion.

161.   In the Critical Vendors Motion, the Debtors request only the authorization to enter into Trade Agreements when the Debtors determine, in their sole discretion, that payment of such Critical Vendor Claims is necessary to enable the Debtors to realize their chapter 11 objectives and that such Trade Agreements are advisable.  The Debtors also request authorization to make payments on account of Critical Vendor Claims in the absence of a Trade Agreement if the Debtors determine, in their business judgment, that the failure to pay such Critical Vendor Claims will result in harm to the Debtors' business

69

Case 19-10289-LSS Doc 686 Filed 04/27/18 Page 76 of 84
Case 1:19-cv-02867-CCC-BGS Document 104 Filed 04/28/19 Page 170 of 784 PageID #: 411
Exhibit C - Part 4 of 5 Nolan Decl    Page 76 of 84

162. I understand that in the event that a Critical Vendor, whether under a Trade Agreement or otherwise, refuses to supply goods and/or services to the Debtors on Customary Trade Terms or Minimum Credit Terms (or such other terms as are agreed by the parties) following receipt of payment on its Critical Vendor Claim or otherwise fails to comply with any Trade Agreement entered into between such Critical Vendor and the Debtors, then the Debtors reserve their rights to take any and all actions necessary to return the parties to the positions they held immediately prior to entry of this Final Order with respect to all prepetition claims, including but not limited to: (a) declaring that any Trade Agreement between the Debtors and such Critical Vendor is terminated; (b) declaring that payments made to such Critical Vendor on account of its Critical Vendor Claims shall be deemed to have been made in payment of then-outstanding (or subsequently accruing) postpetition claims of such Critical Vendor without further order of the Court or action by any person or entity; and (c) recovering or seeking disgorgement of any payment made to such Critical Vendor on account of its Critical Vendor Claims to the extent that such payments exceed the value of the postpetition claims of such Critical Vendor, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense. In addition, the Debtors reserve the right to seek damages or other appropriate remedies against any breaching Critical Vendor.

163. In the Critical Vendors Motion, the Debtors further propose that any Trade Agreement terminated as a result of a Critical Vendor's refusal to comply with the terms thereof may be reinstated if the underlying default under the Trade Agreement is fully cured by the Critical Vendor not later than five business days following the Debtors' notification to the Critical Vendor of such a default, or the Debtors, in their sole discretion, reach a favorable alternative agreement with the Critical Vendor.

US-DOCS\105945964.1

164.   I believe that the relief requested in the Critical Vendor Motion is necessary to permit the Debtors to obtain the timely delivery of goods and uninterrupted provision of services from the Critical Vendors.

**B.      Foreign Vendor Motion**[43]

165.   By the Foreign Vendor Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to pay the prepetition fixed, liquidated, and undisputed claims (the "**Foreign Vendor Claims**") owing to certain foreign suppliers of goods and services, with whom the Debtors continue to do business (the "**Foreign Vendors**") in an amount not to exceed $900,000 on an interim basis and $1,400,000 on a final basis.

166.   As described herein, the Debtors operate multi-national businesses that are primarily engaged in the mining and processing of talc in the United States and Canada, as well as the distribution of their talc products in North America, South America, Europe, and Asia.  Due to the international nature of their supply chain, the Debtors rely on a number of foreign vendors and suppliers to mine and distribute their products.  The foreign vendors and suppliers include businesses based in countries such as China, India, and Canada, among others, and are not believed to have meaningful contacts with the United States.

167.   In the Foreign Vendor Motion, the Debtors propose to pay the Foreign Vendor Claims only for those Foreign Vendors that agree, to the Debtors' satisfaction, to continue to supply goods or services to the Debtors according to (a) the most favorable trade terms and practices (including, without limitation, credit limits, pricing, timing of payments, allowances,

---

[43]      "**Foreign Vendor Motion**" means the *Debtors' Motion for Orders Under 11 U.S.C. §§ 105(a), 363(b), and 1107(a), and Fed. R. Bankr. P. 6003 (I) Authorizing Payment of Prepetition Claims of Foreign Vendors; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief.*

rebates, discounts, and other applicable terms and programs) in effect between the Foreign Vendor and the Debtors within the sixty day period preceding the Petition Date or (b) such other trade terms and practices as agreed to by the Debtors and the Foreign Vendor (the "**Customary Trade Terms**").   However, if the Debtors are unable to negotiate continued supply upon Customary Trade Terms, the Debtors seek authority, based on their business judgment, to pay Foreign Vendors all or a portion of their Foreign Vendor Claims in return for the continued supply of critical goods and services (even if such payment is not according to the Customary Trade Terms).

168.   In the event that a Foreign Vendor refuses to supply goods and/or services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of payment on its Foreign Vendor Claim, the Debtors reserve their rights to return the parties to the positions they held immediately prior to entry of any interim order or final order approving the Foreign Vendor Motion with respect to all prepetition claims.  Further, the Debtors reserve their rights to and may seek approval of the Court to: (a) declare that payments made to such Foreign Vendor on account of its Foreign Vendor Claim be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of such Foreign Vendor without further order of the Court or action by any person or entity; and (b) recover or seek disgorgement of any payment made to such Foreign Vendor on account of its Foreign Vendor Claim to the extent that such payments exceed the value of the postpetition claims of such Foreign Vendor, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense.

169.   I believe that the services, supplies, and equipment provided by the Foreign Vendors are crucial to the Debtors' operations.  I understand that Debtors do not typically engage

with the Foreign Vendors pursuant to long-term contracts.  Rather, purchases are typically

undertaken on a purchase order by purchase order basis.  Thus, I believe that the Debtors do not

have the ability to compel contractual performance across the broad base of their vendors.  Even

if such rights generally existed, I believe they may be of limited utility in this regard.  In particular,

I believe that many of the Foreign Vendors may be unfamiliar with the chapter 11 process,

particularly those in countries with liquidation-oriented insolvency regimes.  I understand that the

"debtor-in-possession" concept at the heart of chapter 11 does not exist in other countries where

"bankruptcy" is equivalent to "liquidation."  Absent prompt and full payment of the Foreign

Vendor Claims, I believe that the Foreign Vendors may therefore refuse to provide the equipment,

supplies, and services that are required by the Debtors and their affiliates during the pendency of

the Chapter 11 Cases.  Even if they do not take such drastic action, it is likely that the Foreign

Vendors will, absent payment, delay providing such equipment, supplies, and services and

thereby expose the Debtors' estates to significant economic harm.

170.    In addition, I understand that many of the Foreign Vendors may not be (or

may assert that they are not) subject to the jurisdiction of this Court.  Although the scope of the

automatic stay set forth in section 362 of the Bankruptcy Code is universal, I believe that there is

a serious risk that certain of the Foreign Vendors holding prepetition claims against the Debtors

may consider themselves to be beyond the jurisdiction of the Court, disregard the automatic stay

provisions of the Bankruptcy Code, and engage in conduct that would disrupt the Debtors'

operations.  Thus, I believe that efforts by the Debtors to enforce this Court's orders and the

applicable provisions of the Bankruptcy Code against them could be cost-prohibitive, time-

consuming, and, possibly, of little practical value as these Foreign Vendors are located primarily

or exclusively in jurisdictions outside of the United States.

171. Even if such Foreign Vendors do not resort to "self-help" remedies, I believe their failure to pay the Foreign Vendor Claims will have an immediate effect on the Chapter 11 Cases. For example, the Debtors currently benefit from favorable trade terms from many such Foreign Vendors, and the Debtors' failure to make timely payments could result in the acceleration or elimination of such terms—thereby imposing a corresponding liquidity drain on these estates. Additionally, I do not believe that the Debtors can readily or easily replace these Foreign Vendors on similar economic terms without impairing their current operations and their ability to mine, process and distribute talc to customers. For the foregoing reasons, I believe that a failure to pay the Foreign Vendor Claims in a timely manner would jeopardize the Chapter 11 Cases.

### C.   Lien Claimant Motion[44]

172. By the Lien Claimant Motion, the Debtors request entry of interim and final orders (i) authorizing, but not directing, the Debtors to pay prepetition claims held by (a) shippers, (b) lien claimants and (c) royalty interest owners, (ii) authorizing, but not directing, the Debtors to pay 503(b)(9) claims, (iii) confirming the administrative expense priority status of outstanding orders for goods that will not be delivered until on or after the Petition Date and authorizing, but not directing, the Debtors to pay prepetition amounts related to such outstanding orders, and (iv) granting related relief.

173. A summary of the specific relief requested herein is set forth below:

---

[44]     "**Lien Claimant Motion**" means *Debtors' Motion for Orders Under 11 U.S.C. §§ 105(a), 363(b), 503(b), 1107(a), and 1108 and Fed. R. Bankr. P. 6003 (I) Authorizing Debtors to Pay Certain Prepetition Claims of Shippers, Lien Claimants, and 503(b)(9) Claimants, (II) Confirming Administrative Expense Priority of Undisputed and Outstanding Prepetition Orders, and (III) Granting Related Relief.*

|  | Interim Relief | Final Relief |
|---|---|---|
| **Shipping Claims** | $1,900,000 | $3,300,000 |
| **Lien Claims** | $1,000,000 | $1,400,000 |
| **Royalty Payments** | $200,000 | $900,000 |
| **503(b)(9) Claims** | $300,000 | $300,000 |

174.   As described herein, the Debtors are primarily engaged in the mining, processing, and/or distribution of talc.  I believe that the Debtors' ability to operate their business without interruptions is dependent upon the Debtors' vendors, suppliers, shippers and warehousemen, each of which either provides the Debtors with the materials and supplies necessary to ensure safe mining conditions, extract and process talc, transport talc among the Debtors' mines and plants, or deliver talc to the Debtors' customers.  As more fully described in the Lien Claimant Motion, the Debtors utilize the services of a number of service providers who, by the nature of their business and the work that they perform for the Debtors, may be able to assert that prepetition amounts owed to them are secured by statutory liens on property of the Debtors that is either in the possession of the service provider or that has been improved upon by the provider.  The Debtors are also obligated to make royalty payments to certain royalty interest owners who may assert that prepetition royalty payments owed to them are secured by liens on the Debtors' property.  Moreover, amounts held by the Debtors on account of the royalty interests may not be property of the Debtors' bankruptcy estates.  In addition, the claims of certain providers of goods to the Debtors may be entitled to priority under section 503 of the Bankruptcy Code because such goods were delivered to the Debtors within twenty days prior to the Petition Date.  In order to continue the operation of their business uninterrupted postpetition, the Debtors seek to pay the prepetition claims of these claimants, each of which may be entitled to priority over general unsecured creditors.

US-DOCS\105945964.1

## CONCLUSION

175.    The Debtors' ultimate goal in these Chapter 11 Cases is to confirm a plan of reorganization providing for trust mechanisms that will address all current and future Talc Claims against the Debtors while simultaneously preserving value and allowing the Debtors to emerge from chapter 11 free of historic talc-related liabilities.   In the near term, however, to minimize any loss of value of their businesses during these Chapter 11 Cases, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the early stages of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and confirmation of a chapter 11 plan will be substantially enhanced.

176.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13 day of February 2019.


/s/ Alexandra Picard
_____
Alexandra Picard
Chief Financial Officer of Imerys Talc
America, Inc., Imerys Talc Vermont, Inc. and
Imerys Talc Canada Inc.

## Exhibit A

Simplified Imerys Group Organizational Chart